IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 4, 2022 Session

**IN RE: JONATHAN S.**

**Appeal from the Juvenile Court for Davidson County
No. 2009-2850, PT248521 Sheila Calloway, Judge**

_____

**No. M2021-00370-COA-R3-JV**

_____

In this post-divorce case, Mother appeals the trial court's grant of Father's petition to modify the permanent parenting plan and its modification of her child support obligation. Mother also appeals the denial of her petition to be named the Child's primary residential parent. Father requests attorney's fees incurred on appeal. Because the income the trial court imputed to Mother is not supported by the evidence in the record, and because the trial court failed to find a significant variance before modifying Mother's child support obligation, we vacate the trial court's order modifying Mother's child support. The trial court's order is otherwise affirmed, and Father's request for appellate attorney's fees is denied.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Vacated in Part; Affirmed in Part; and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Elizabeth M., Cleveland, Tennessee, appellant, pro se.

Tarsila Crawford and James Widrig, Brentwood, Tennessee, for the appellee, Jonathan S.

**OPINION**

**I. Background**

This is the third appeal of this child-custody case. In the interest of consistency and judicial economy, we restate certain relevant facts from our previous opinions:

Elizabeth [M]. ("Mother") and Jonathan S. ("Father") have one child together, Jonathan S. Jr. [(the "Child")], born in February 2009.[1] Mother and Father were never married, and their relationship ended several months after the [C]hild was born. In June 2014, the Davidson County Juvenile Court [("trial court")] entered an agreed permanent parenting plan [(the "2014 Parenting Plan")] that designated Mother as the [C]hild's primary residential parent and permitted Father to exercise parenting time one weekend per month and for extended periods during school holidays. By then, Mother was married and living in Nashville with her husband; Father was living in Michigan.

*In re Jonathan S. Jr.*, No. M2016-01365-COA-R3-JV, 2017 WL 3149600, at *1 (Tenn. Ct. App. July 24, 2017) ("*In re Jonathan I*").

In July 2015, Father filed a petition to modify the 2014 Parenting Plan, requesting that he be named the Child's primary residential parent. *In re Jonathan S.*, No. M2018-02072-COA-R3-JV, 2019 WL 6770517, at *1 (Tenn. Ct. App. Dec. 12, 2019) ("*In re Jonathan II*"). As explained in *In re Jonathan II*, on April 6, 2018, the trial court "entered an order . . . on Father's [petition to modify], wherein it found that there had been a material change in circumstances and that it was in the Child's best interest to primarily reside with Father in Michigan[.]" *Id.* at *2. Relevant here, the trial court found that Mother had separated from her then-husband, lost her housing, and lost her job, all within a short period of time. The trial court entered a new parenting plan (the "2018 Parenting Plan"), which provided, in pertinent part, that: (1) Father be designated the primary residential parent; (2) the Child would spend 107 days with Mother and 258 days with Father; (3) Mother was awarded "discretionary" visits with the Child one weekend per month in Michigan, and she was required to give Father two-weeks' notice before exercising visitation; (4) Mother was granted visitation, in Tennessee, on every Martin Luther King Day, President's Day, Easter, Mother's Day, and Memorial Day; (5) the parties were awarded visitation during the summer and winter breaks; (6) the parties alternated the Thanksgiving and Christmas holidays; (7) the parties could either drive or fly the Child for his visits with Mother in Tennessee; (8) if the parties flew the Child for Mother's visitation, they would split the cost of the plane ticket; (9) the parties made major decisions jointly; (10) Father would carry primary insurance for the Child, and Mother would carry secondary insurance; (11) Mother was awarded a health insurance credit of $30.00 per month, and Father was awarded a health insurance credit of $222.77 per month; and (12) Mother would pay $106.00 per month in child support. On Mother's appeal, this Court affirmed the trial court's change of the primary residential parent and modification of the parenting plan. *Id.* at *6.

---

[1] In cases involving a minor child, it is the policy of this Court to redact the names of certain individuals in order to protect the child's privacy.

On April 18, 2019, while ***In re Jonathan II*** was pending before this Court, Father filed another petition, in the trial court, to modify the 2018 Parenting Plan due to Mother's alleged medical neglect of the Child. In the petition, Father asserted that "there ha[d] been material changes in circumstances warranting a modification of the 2018 Parenting Plan." Specifically, Father alleged that Mother: (1) refused to consent to "critical medical care of the [C]hild"; (2) failed to exercise her discretionary parenting time on the weekends in Michigan; (3) failed to consistently schedule the Child's visits to Tennessee; (4) refused to reimburse Father for the Child's medical bills; and (5) quit her job. Father argued that it was in the Child's best interest that Father be awarded sole decision-making authority over healthcare, extracurricular activities, and the Child's education, and he asked the trial court to modify the 2018 Parenting Plan accordingly. Father also asked the trial court to modify Mother's child support obligation and to award him judgment against her for unpaid medical bills. Additionally, Father argued that Mother should not receive a credit for paying the Child's health insurance because she lost her health insurance when she quit her job. We note that, by the time Father filed the current petition to modify, Mother had divorced her previous husband, married her current husband, and obtained health insurance through her current husband's employer.

On February 13, 2020, Mother filed an answer to Father's petition as well as a counter-petition to modify the Child's primary residential parent, i.e., custody. In the counter-petition, Mother agreed that there had been "a material change in circumstances affecting the [C]hild's best interest, such that warrants a modification of custody." Specifically, Mother alleged that: (1) the Child had not adjusted well to the change in custody and his move to Michigan; (2) Father was forcing the Child to visit with various doctors, despite the Child being healthy, "in an effort to try to make [] Mother look bad to the [c]ourt"; and (3) it was in the Child's best interest that Mother be awarded custody and that the Child move back to Tennessee. On June 1, 2020, Father filed an answer to Mother's counter-petition.

The trial court heard the competing petitions on September 2, 3, and 4, 2020. The following witnesses testified at trial: (1) Father; (2) Laurence H., paternal step-grandfather; (3) Justin P., Mother's former supervisor at Ritchie Brother's Auctioneers ("Ritchie Brother's"); (4) Mother; (5) Carol M., the Child's former pediatric nurse practitioner; (6) Lynne V., maternal grandmother; and (7) Kathleen S., step-mother. On Mother's request, the trial court also briefly questioned the Child.

By order of November 16, 2020, the trial court found that: (1) both parties agreed that there had been a material change in circumstances; and (2) Father was asking for a modification to the residential parenting schedule while Mother was asking for a change in custody. After analyzing the relevant best interest factors, the trial court granted Father's petition to modify the parenting plan and dismissed Mother's petition to modify custody. The trial court held that the parents would exercise joint-custody, with Father remaining

- 3 -

the primary residential parent. The trial court found that Mother was underemployed and imputed her income at $3,583.07 per month, the rate of pay from her previous employer, Ritchie Brother's. Thus, the trial court ordered Mother to pay $366.00 per month in child support to Father. The trial court also ordered each party to pay his or her respective attorney's fees.

The trial court attached to its final order a new permanent parenting plan (the "2020 Parenting Plan"). The 2020 Parenting Plan provided, in pertinent part, that the parties would make major decisions jointly, but that Father would make the final decision when the parties disagreed. The plan also provided that Mother could file a motion with the trial court to object to any decisions with which she disagreed. The 2020 Parenting Plan allowed Mother to keep her one-weekend-per-month visits with the Child in Michigan so long as she gave Father two-weeks' written notice before exercising visitation. The plan also provided that Mother could exercise her Martin Luther King Day, Presidents' Day, Easter Day, Memorial Day, and Labor Day visits in Tennessee *only if* the Child flew to Tennessee for the visit, *and* Mother reimbursed Father for her portion of a plane ticket; otherwise, the visits were to occur in Michigan. For the Child's longer visits in Tennessee, the plan provided that the parties would exchange the Child in Covington, Kentucky, unless otherwise agreed upon in writing. The 2020 Parenting Plan also provided that Father would provide the Child's health and dental insurance. The 2020 Parenting Plan incorporated a child support worksheet, which listed Mother's gross income as $3,583.07 per month. The worksheet also charged Mother $69.06 for her share of the Child's health insurance premium paid by Father. Mother did not receive a credit for health insurance.

On December 15, 2020, Mother filed a "Motion for Relief Under Rule 59 and 60 to Clarify Orders of this Court and Correct Clerical Errors, Motion to Alter or Amend Judgment Under Rule 60." In the motion, Mother asked the trial court to reconsider the Child's travel arrangements, arguing that traveling by plane would place the Child at risk for contracting the coronavirus. Mother also alleged that, although the Child was in 6th grade at the time, he was reading at a 3rd grade level; she alleged that this information was not available at the time of trial. Mother also argued that many aspects of the visitation schedule were unworkable. Additionally, Mother argued that her child support obligation was not based on her most current income. Mother also objected to the trial court ordering Father, alone, to maintain health and dental insurance for the Child. Finally, Mother asked the trial court to correct parts of the 2020 Parenting Plan that were left blank. On February 17, 2021, Father filed a response and a counter-motion to alter or amend, opposing each of Mother's arguments/requests except that the trial court correct the clerical errors and missing information. In his motion, Father asked the trial court to: (1) issue a judgment against Mother for unpaid medical expenses; and (2) order that Father be allowed to book the flights from Michigan to Tennessee, with Mother reimbursing him.

On March 12, 2021, the trial court entered its order on the parties' competing motions. In its order, the trial court declined to alter its final order but did correct certain

clerical errors. In pertinent part, the trial court: (1) ordered that Father would purchase plane tickets for the Child, and that the parties would split the cost of same; (2) "maintained Father as Primary Residential Parent with sole decision-making for non-emergency medical care"; (3) declined to alter the final order as to Mother's child support obligation; (4) declined to issue a judgment against Mother for unpaid medical expenses; and (5) ordered that only Father would maintain health and dental insurance for the Child. Mother appeals.

## II. Issues

Mother raises five issues as stated in her appellate brief:

1. Whether the trial court erred in the dismissal of Mother's counter petition to modify custody based on material change of circumstances.
a. Whether the trial court erred in its findings of fact and conclusions of law, as the same are contrary to the preponderance of the evidence.
b. Whether the trial court erred in not finding a material change in circumstances such as to warrant a change of custody when there was evidence that the changes affected the Child's well-being in a meaningful way.

2. Whether the trial court erred in finding a change of custody was not in the Child's best interest.
a. Whether the trial court erred in its application of the factors at Tenn. Code Ann. § 36-6-106(a).

3. Whether the trial court erred in the calculations of the child support worksheet.
a. Whether the trial court erred in its findings of fact and conclusions of law, as the same are contrary to the preponderance of the evidence.

4. Whether the trial court erred in granting Father's petition to modify the permanent parenting plan due to Mother's medical neglect.
a. Whether the trial court erred in its findings of fact and conclusions of law, as the same are contrary to the preponderance of the evidence.
b. Whether the trial court erre[d] in adhering to the requirements outlined in Tenn. Code Ann. § 36-6-404.

5. Whether the trial court demonstrated conduct prejudicial to the effective and expeditious administration of the business of the courts.

In the posture of Appellee, Father requests attorney's fees incurred in this appeal.

## III. Standard of Review

We review a non-jury case "de novo upon the record with a presumption of correctness as to the findings of fact, unless the preponderance of the evidence is otherwise." *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citing Tenn. R. App. P. 13(d)). The trial court's conclusions of law are reviewed de novo and "are accorded no presumption of correctness." *Brunswick Acceptance Co., LLC v. MEJ, LLC*, 292 S.W.3d 638, 642 (Tenn. 2008).

Furthermore, while we are cognizant of the fact that Mother is representing herself in this appeal, it is well-settled that "pro se litigants are held to the same procedural and substantive standards to which lawyers must adhere." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 46 (Tenn. Ct. App. 2013). This Court has held that "[p]arties who choose to represent themselves are entitled to fair and equal treatment by the courts." *Hodges v. Tenn. Att'y Gen*., 43 S.W.3d 918, 920 (Tenn. Ct. App. 2000) (citing *Paehler v. Union Planters Nat'l Bank, Inc*., 971 S.W.2d 393, 396 (Tenn. Ct. App. 1997)). Nevertheless, "courts must not excuse pro se litigants from complying with the same substantive and procedural rules that represented parties are expected to observe." *Young v. Barrow*, 130 S.W.3d 59, 63 (Tenn. Ct. App. 2003) (citing *Edmundson v. Pratt*, 945 S.W.2d 754, 755 (Tenn. Ct. App. 1996); *Kaylor v. Bradley*, 912 S.W.2d 728, 733 n.4 (Tenn. Ct. App. 1995)). With the foregoing in mind, we turn to address the substantive issues.

## IV. Procedural Deficiencies

As an initial matter, Mother's appellate brief contains some procedural defects, which we address before adjudicating the remaining issues.

### A. Facts Considered on Appeal

Mother presents some factual allegations in her appellate brief that are not supported by the record established at trial. Mother also attached appendices to her appellate brief, some of which contain documents that are not in the appellate record. The only facts this Court may consider on appeal are those "established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to rule 14." Tenn. R. App. P. 13(c).[2] To the extent Mother's brief

---

[2] Judicial notice is

"a method of dispensing with the necessity for taking proof." *State ex rel. Schmittou v. City of Nashville*, 345 S.W.2d 874, 883 ([Tenn.] 1961). "[It] is generally defined as a judge's utilization of knowledge other than that derived from formal evidentiary proof in the pending case." *Counts v. Bryan*, 182 S.W.3d 288, 291 (Tenn. Ct. App. 2005) . . . . Historical facts, such as who, what or when, are more likely to satisfy this criteria, as opposed to opinions, which are more likely to be subject to dispute. [*Id.* at 293].

presents facts that were either not before the trial court and/or not contained in the appellate record, we will not consider such facts in our review.

## B. Tennessee Code Annotated Section 36-6-404

As set out above, Mother presents the issue of "[w]hether the trial court erre[d] in adhering to the requirements outlined in Tenn[essee] Code Ann[otated] [section] 36-6-404." In this section of her brief, Mother presents no argument; instead, this portion of her brief includes only a partial recitation of a previous version of section 36-6-404. As such, this Court is unsure of Mother's argument or complaint concerning section 36-6-404. Tennessee Rule of Appellate Procedure 27(a)(7)(A) provides that an appellant's brief *shall contain an argument* setting forth "the contentions of the appellant with respect to the issues presented . . . with citations to the authorities and appropriate references to the record . . . ." Tenn. R. App. P. 27(a)(7)(A). As the Tennessee Supreme Court has stated, "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and *where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument*, the issue is waived." **Sneed v. Bd. of Pro. Resp. of Supreme Ct.**, 301 S.W.3d 603, 615 (Tenn. 2010) (emphasis added); *see also* **Forbess v. Forbess**, 370 S.W.3d 347, 355 (Tenn. Ct. App. 2011) ("This [C]ourt has repeatedly held that a party's failure to cite authority for its arguments or to argue the issues in the body of its brief constitute a waiver on appeal."). Unfortunately, we do not reach this issue because Mother's brief fails to comport with the Tennessee Rules of Appellate Procedure in that it fails to include any argument on which this Court can make a meaningful review.

## C. Trial Court's Alleged Prejudicial Conduct

Mother also raises the issue of "[w]hether the trial court demonstrated conduct prejudicial to the effective and expeditious administration of the business of the courts." Although stated as an issue, Mother cites no legal authority as support and again provides no argument for this Court's review. Rather, Mother vaguely asks this Court to consider several "issues that occurred during the trial." For the reasons discussed, *supra*, we do not reach this issue because Mother's brief fails to comport with the Tennessee Rules of Appellate Procedure. Tenn. R. App. P. 27(a)(7)(A); **Sneed**, 301 S.W.3d at 615; **Forbess**, 370 S.W.3d at 355. Although Mother fails to properly brief this issue, as explained above,

---

**Bank of Am., Nat'l Ass'n v. Meyer**, No. M2014-01123-COA-R3-CV, 2015 WL 1275394, at *2-3 (Tenn. Ct. App. Mar. 17, 2015). Tennessee Rule of Appellate Procedure 14 allows this Court to consider facts "that occurred *after* judgment," but such consideration "lies in the discretion of the appellate court." Tenn. R. App. P. 14(a) (emphasis added). As stated in the rule, "consideration generally will extend only to those facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters." Tenn. R. App. P. 14(a).

in our review, we have considered the entire record.

## V. Analysis

### A. Modification of 2018 Parenting Plan

Turning to the remaining issues on appeal, Mother argues that the trial court erred in granting Father's petition to modify the parenting plan and in denying her petition to modify the primary residential parent designation, i.e., custody. Once a permanent parenting plan has been established, "the parties are required to comply with it unless and until it is modified as permitted by law." *Armbrister v. Armbrister*, 414 S.W.3d 685, 697 (Tenn. 2013) (citing Tenn. Code Ann. § 36-6-405). It is well-settled that courts must apply a two-step analysis in addressing requests for modification of either the primary residential parent designation or the residential parenting schedule. *Gentile v. Gentile*, No. M2014-01356-COA-R3-CV, 2015 WL 8482047, at *4 (Tenn. Ct. App. Dec. 9, 2015). The threshold question is whether a material change in circumstances has occurred since entry of the trial court's previous order. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). If a court finds that there has been a material change in circumstances, then it must decide whether modification of the parenting plan is in the child's best interest. *Armbrister*, 414 S.W.3d at 698.

Before turning to review the trial court's order, we first consider the scope of our review. As the Tennessee Supreme Court has explained, appellate courts have a *limited* scope of review of "a trial court's factual determinations in matters involving child custody and parenting plan developments." *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017). Because "[a] trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions," this Court "must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings." *Id.* (quoting *Armbrister*, 414 S.W.3d at 692). Similarly, appellate courts will not interfere with a trial court's custody determination or decision concerning a parenting schedule absent an abuse of discretion. *See C.W.H.*, 538 S.W.3d at 495; *Armbrister*, 414 S.W.3d at 693; *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001); *Dungey v. Dungey*, No. M2020-00277-COA-R3-CV, 2020 WL 5666906, at *2 (Tenn. Ct. App. Sept. 23, 2020). "'An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.'" *C.W.H.*, 538 S.W.3d at 495 (quoting *Armbrister*, 414 S.W.3d at 693). Indeed, this Court may reverse a trial court's decision concerning custody or a parenting plan "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence." *Dungey*, 2020 WL 5666906, at *2 (quoting *C.W.H.*, 538 S.W.3d at 495). With the foregoing law in mind, we turn to review the trial court's order.

## 1. Relevant Findings of Fact

As an initial matter, the trial court made the following findings concerning the parties' struggles to co-parent under the 2018 Parenting Plan:

8. Since [the 2018 Parenting Plan was entered], the parties have been having difficulties following the parenting plan as ordered. Mother was granted one weekend each month of parenting time with the [C]hild to occur in Michigan. Due to the distance and the cost, Mother has not been able to follow through on the parenting time on a consistent basis.[3]

9. As to the parenting time Mother exercises in Tennessee, the parents have not been able to agree on flights for the [C]hild. Therefore, the [C]hild must ride in the car for a 16-20 hour drive. According to the [C]hild, he would much rather fly than ride in the car for that lengthy time period.

10. The [C]hild is currently eleven years old and in the sixth grade. Overall, he is doing well with Father and enjoys living with him. According to the [C]hild, he prefers living with his [F]ather and visiting with his [M]other during the summers. For child care purposes when necessary, either Father's wife or his father-in-law have been able to assist when Father is at work.

11. The [C]hild is currently in therapy as arranged by Father. The therapist has helped with the [C]hild's focus, anxiety, and [is] teaching the [C]hild to advocate for himself. Although Father feels the therapy is useful for the [C]hild, Mother has not been supportive nor has she attempted to continue any type of therapy with the [C]hild when he is in Tennessee.

12. On many occasions Father has been frustrated with Mother because of her refusal to agree with treatment and programs for the [C]hild. In one instance, the [C]hild had a foot fungus. Mother would not agree with the recommended treatment of the podiatrist. As to a program, Father signed up the [C]hild to play the drums with a youth band. Mother would not consent to allow him to play because she was concerned with the location of the concert. The [C]hild was very disappointed that he was not allowed to

---

[3] The record shows that Mother did not consistently exercise her discretionary visitation in Michigan. Rather, Mother visited with the Child in Michigan only four or five times in two years. During her testimony, Mother admitted that she "ha[s] not been able to get to Michigan every single month." According to Father's testimony, the Child was aware that Mother should have been visiting, and he was disappointed and sad when she did not. Father also testified that it was difficult to plan weekend activities with the Child given that Mother was required to provide only two-weeks' notice before exercising her visits in Michigan. Nonetheless, the trial court did not modify the two-weeks' notice requirement, and Father does not appeal this decision.

- 9 -

participate in an activity he was looking forward to doing.

\*\*\*

14. [Regarding Father's petition for modification], Father's main concern was the lack of support Mother has for the [C]hild's counseling as well as the foot fungus incident. Despite Father's concern, Carol [M.] testified as to Mother's diligence of having consistent check-ups and pediatric visits for the [C]hild when the [C]hild is with her. She also testified that Mother followed up on all vaccines which were required for the [C]hild [for public school].

\*\*\*

17. Unfortunately, the parents are still struggling to effectively communicate with one another and co-parent their child as time passes. The further they seem to live physically from one another is similar to the further they are in effectively co-parenting.

The record supports the foregoing findings. As an initial matter, the record shows that the parties have been unable to agree on transportation for the Child when he visits Mother in Tennessee. Under the 2018 Parenting Plan, the parties were given the discretion to choose between driving the Child for his visits with Mother or flying the Child and sharing the cost of a flight. The record shows that the parties disagree concerning whether the Child should be driven or flown, and, if he flies, the parties disagree on the particular travel arrangements.

The record also supports the trial court's finding that "Father has been frustrated with Mother because of her refusal to agree with treatment and [extracurricular] programs for the [C]hild." Under the 2018 Parenting Plan, the parties exercised joint decision-making over all major decisions, including non-emergency medical treatment and the Child's extracurricular activities. Although the record is replete with examples of the parties' disagreements related to these decisions, we focus on the issue involving the Child's toe fungus as that was clearly the catalyst for Father filing the petition to modify the parenting plan. The record shows that the Child suffered from a toe fungus, and that Father took the Child to a podiatrist for treatment. To treat the fungus, Father wanted to place the Child on an oral medication, but Mother objected, requesting that the Child receive a topical antifungal instead. At Mother's request, the Child was prescribed and used a topical antifungal for one year, but this treatment did not cure the problem. Despite the fact that the topical antifungal failed to mitigate the toe fungus, Mother refused to consent to oral medication, and Father filed his petition for modification. The parties appeared before a magistrate judge and jointly called the Child's podiatrist to discuss treatment options. Although Mother asked about homeopathic or natural remedies to treat

- 10 -

the toe, the podiatrist recommended oral medication. The magistrate allowed Mother to seek a second opinion from another podiatrist. However, before Mother procured the second opinion, Father found the Child attempting to cut off parts of his toenail to remove the fungus himself. According to Father's testimony, the next day was field day at the Child's school, and the Child wanted to go into the bounce house with his socks off but was embarrassed for people to see his toe. The record shows that Father took the Child to the podiatrist the following day and started him on an oral medication, which cleared the fungal infection. Despite the dispute over treatment for the Child's toe fungus, the record does support the trial court's finding that the Child received yearly check-ups and all required vaccinations when he was in Mother's care. In short, it appears that both parents are concerned for the Child's physical well-being, but they disagree and are unable to communicate concerning the best way to approach his care.

The parents are equally at odds concerning the Child's therapy. As the trial court noted, the Child is in therapy, as arranged by Father. The Child testified that therapy was going well, that his therapist was really nice, and that he was glad he was able to speak with her about the things going on in his life. The record shows that therapy has helped the Child to become more focused, and has also helped the Child with advocacy skills. The record supports the trial court's finding that Mother has not been very supportive of the Child's therapy in Michigan. Specifically, the proof showed that Father sought therapists and other mental health practitioners. Although Mother objected to particular providers recommended by Father, she offered no alternative solutions so the Child could continue his therapeutic treatment. Similarly, while Mother was invited to each session the Child had with his therapist in Michigan (either in person or virtually), she has never participated.

The foregoing findings are also supported by the Child's testimony. Specifically, the Child testified that he: (1) "like[s] where [he's] at right now in Michigan"; (2) is "making friends in school"; and (3) enjoys visiting Mother during the summer in Tennessee. Furthermore, the Child unequivocally testified that it is his preference to fly to see his Mother "[e]very single time." Moreover, the Child testified concerning Mother's revocation of consent for his youth rock band concert. As the trial court found, Father signed the Child up to play drums in a "School of Rock" band. According to Father's testimony, he provided Mother with all of the information concerning the rock band, including when and where the Child would perform a concert in the future. The record shows that the Child practiced for a few months prior to a performance at a local restaurant. Despite the Child spending hours practicing for this performance, the week before the performance, Mother withdrew her consent. Mother testified that she did not want the Child playing in any establishment that serves alcohol because "it's against [her] husband's beliefs[, and] [i]t's against [her] father-in-law's beliefs." When asked if it was against Mother's beliefs, she testified: "I don't want my child playing in an establishment with alcohol." Concerning the performance, the Child testified that he was "really . . . upset, like sad" when he was not allowed to perform because he had been practicing for "a month or two." The foregoing evidence does not preponderate against the trial court's above

findings of fact, *see C.W.H.*, 538 S.W.3d at 495, and we are mindful of such evidence as we turn to review the trial court's conclusions of law.

## 2. Material Change in Circumstances

As discussed above, the threshold question courts must answer before modifying a permanent parenting plan is whether a material change in circumstances has occurred since entry of the trial court's previous order. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). Importantly, we note that "[a] change in circumstance with regard to a residential parenting schedule is 'a distinct concept' from a change in circumstance with regard to custody." *Burnett v. Burnett*, No. M2014-00833-COA-R3-CV, 2015 WL 5157489, at *6 (Tenn. Ct. App. Aug. 31, 2015) (quoting *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007)); *see also* Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). Although both changes must be proved by a preponderance of the evidence, *see* Tenn. Code Ann. § 36-6-101(a)(2)(B), (C), the threshold for establishing a material change in circumstances where the issue before the trial court is a modification of the residential parenting schedule is much lower than what is required to establish a material change in circumstances to modify the primary residential parent, i.e., custody. *Burnett*, 2015 WL 5157489, at *6. As an initial matter, "[a] material change of circumstance does not require a showing of a substantial risk of harm to the child" under either modification. Tenn. Code Ann. § 36-6-101(a)(2)(B)(i), (C). Concerning a modification of custody, Tennessee Code Annotated section 36-6-101(a)(2)(B)(i) provides that a "[a] material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(B)(i). Concerning a modification of the residential parenting schedule, Tennessee Code Annotated section 36-6-101(a)(2)(C) provides that a material change of circumstances

> may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(C).

Although the trial court recognized this distinction in its final order, it failed to specify whether both standards were met in this case. Concerning whether a material change in circumstances existed, the trial court concluded:

> In this case, both Mother and Father agree that there has been a material change of circumstances. Both parties recognize that the current parenting

- 12 -

plan schedule is not working well. Both parties are frustrated with the difficulties they are having in making decisions for the best interest of the [C]hild. Although Father is only asking for a modification as to the way Mother's time is allocated in the parenting plan, Mother is requesting a change in custody.

It is not clear from the trial court's order whether it held that there had been a material change in circumstances sufficient to alter both custody and the residential parenting schedule. However, because it proceeded to a best interest analysis, we infer that the trial court concluded that both standards for a material change in circumstances were met. Regardless, because neither party raises an issue on appeal as to whether a material change in circumstances existed sufficient to modify either custody or the residential parenting schedule, we do not address that question here. Rather, we assume, *arguendo*, that the material change in circumstances here is sufficient to cover the threshold requirement for both parties' petitions. However, we caution that when a case involves both a petition for change of custody and a petition to modify a parenting plan, as is the scenario here, the trial court should endeavor to clarify whether a material change in circumstances satisfies the standard for either or both petitions.

### 3. Best Interest

After concluding that the parties agreed to a material change in circumstances, the trial court proceeded to conduct a best interest analysis. "Whether modification of a parenting plan serves a child's best interests [is a] factual question[]." ***Armbrister***, 414 S.W.3d at 692. "The pertinent factors to be considered in the best interest analysis are set forth in Tennessee Code Annotated section 36-6-106." ***C.W.H.***, 538 S.W.3d at 497. As this Court has explained, "[a]scertaining a child's best interests does not call for a rote examination" of each of the factors "and then a determination of whether the sum of the factors tips in favor or against [one] parent." ***In re Marr***, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005). Furthermore, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." ***Id.*** In its final order, the trial court addressed the relevant best interest factors, which we review below.

### Factors Equal for Both Parents (1, 2, 4, 5, and 6)

The trial court concluded that the following factors applied equally for both parents:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the

- 13 -

parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

\*\*\*

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

Tenn. Code Ann. § 36-6-106(a)(1), (2), (4), (5), (6). Concerning the first factor, the trial court concluded that, while Mother "performed the majority of parenting responsibilities throughout the [C]hild's life up until the last three years when the Court changed custody to Father, Father has shown more stability for the [C]hild in recent years." Concerning the second factor, the trial court concluded that, although the parties initially "demonstrated a willingness to work together and devise a parenting schedule that maximizes time with each parent[,]" in recent years the parents' "willingness to cooperate with one another has declined." According to the trial court, "[e]ach parent is struggling to work with the other parent on all issues from medical care, to extracurricular activities, to phone calls, and travel for the ordered parenting time." Further, "due to the physical distance between the parties, it makes it difficult to devise a schedule which will allow for the maximum participation of both parents." The trial court also concluded that it had "no concerns about the [C]hild's needs being met by both parents," and that both "parents share a loving and close relationship with the [C]hild and are emotionally attached." Additionally, the trial court concluded that, "[a]lthough Mother performed the majority of the parenting responsibilities since the [C]hild's birth, Father has been the primary caregiver for the last three years." Regarding the last three years, the trial court concluded that Mother had "not participated much in [the C]hild's life, including his education and medical care."

- 14 -

**Neutral Factors (8, 9, 12, and 14)**

The trial court concluded that the following factors were neutral:

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

\*\*\*

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

\*\*\*

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules[.]

Tenn. Code Ann. § 36-6-106(a)(8), (9), (12), (14). Concerning these factors, the trial court concluded that "[t]he [C]hild has positive interactions with relatives on both sides of his family," and that, while Father expressed concerns regarding "Mother's new husband, there was no evidence to support the concerns." Regarding the parties' employment schedules, the trial court concluded that "Father has had a stable job for several years and has a typical work schedule" while "Mother is currently a stay-at-home wife."

**Factors that Favor Father (7 and 10)**

The trial court found that the following factors favored Father:

(7) The emotional needs and developmental level of the child;

\*\*\*

- 15 -

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

Tenn. Code Ann. § 36-6-106(a)(7), (10). Concerning the seventh factor, the trial court concluded that it "slightly" favored Father because, "[a]lthough both parties are concerned about the developmental level of the [C]hild, [] Father took additional steps to seek therapy for the [C]hild[,]" and "Mother continued to object to any therapist Father found for the [C]hild." Further, the trial court concluded that "Mother's continuous objections slowed down the time Father was able to set up therapy." Regarding the tenth factor, i.e., stability and continuity in the Child's life, the trial court held:

Although Mother was the primary caregiver for the [C]hild's first seven to eight years, Mother's changes and moves disrupted the stability of the [C]hild. Mother has now entered into her third marriage and has moved once again. Since moving with Father in Michigan, [the C]hild has been in a stable, satisfactory environment.

### The Child's Preference (13)[4]

Finally, the trial court considered the following factor:

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

Tenn. Code Ann. § 36-6-106(a)(13). Concerning this factor, the trial court concluded:

Although the [C]hild is only eleven (11) years old, he was permitted to testify as Mother's witness. It was clear from his testimony that he would prefer to stay in Michigan with Father and visit with Mother in Tennessee. He would also appreciate being able to fly to Tennessee instead of the long car ride. Although Mother believes the [C]hild is being coached, the [C]hild seemed to speak freely and had no idea that his parents were also listening.

Based on the foregoing findings, factors, and conclusions, the trial court granted Father's petition to modify the parenting plan and denied Mother's petition to modify the

---

[4] We note that the trial court included Tennessee Code Annotated section 36-6-106(a)(11) in its final order, which factor provides: "Evidence of physical or emotional abuse to the child, to the other parent or to any other person." The trial court found that, "[a]lthough Mother argued that Father is emotionally abusive to her and to the [C]hild, there is no proof presented to support her claims." The record supports the trial court's finding.

primary residential parent designation.  In so doing, the trial court impliedly concluded that modifying the parenting plan was in the Child's best interest, but modifying custody, i.e., changing the primary residential parent to Mother, was not.  On our review, we conclude that the record supports the trial court's denial of Mother's petition to modify the Child's primary residential parent.  Additionally, except for the trial court's modification of Mother's child support obligation, discussed further *infra*, the record supports the trial court's modification of the parenting plan.

### a.  No Modification of Primary Residential Parent (Custody)

As an initial matter, it is clear from the record that, as the trial court found, both parents love the Child and are closely bonded with him.  The record shows that the Child also shares a close relationship with his step-mother and his step-grandfather on his Father's side as well as his grandmother on his Mother's side.  Further, the record shows that the Child is very active, loves spending time outdoors, and that both parents encourage the Child's various outdoor activities.  As the trial court found, Father has stable employment, and Mother is a stay-at-home wife.  Indeed, the record shows that the Child enjoys a loving and supportive environment with both his parents.  However, based on the current stability the Child has with his Father, and in view of the Child's age, there is simply no evidence to support a change of the primary residential parent or to suggest that it would be in the Child's best interest to move to Tennessee with Mother.  Indeed, the record demonstrates that it is not only the Child's preference to remain in Michigan, but that Father and his family have provided great care for the Child's needs, both physically and emotionally, and the Child is doing well in Michigan.  Accordingly, we affirm the trial court's denial of Mother's petition to modify the primary residential parent.

### b.  Modification of Decision-Making Authority, Travel Arrangements, and Health Insurance

It appears from her appellate brief that Mother takes issue with the following specific changes the trial court made to the parenting plan: (1) Father receiving decision-making authority; (2) Father reserving flights for the Child's visits to Tennessee; (3) Father being the only parent to provide health and dental insurance for the Child; and (4) the modification of Mother's child support obligation.  We will discuss each of these changes below.  However, as an initial matter, we note that the trial court's orders concerning decision-making authority conflict.  In the 2020 Parenting Plan, the trial court ostensibly awarded the parties joint decision-making over all major decisions, but the trial court limited Mother's decision-making as follows: "If the parties [cannot] agree on a major decision, as the Primary Residential Parent, Father can make the final decision.  Mother may file a motion with the court to object."  However, in its order on the motions to alter or amend, the trial court "maintained Father as Primary Residential Parent with sole decision-making for non-emergency medical care."  Accordingly, it is unclear whether Father was awarded sole decision-making authority for all major decisions or whether his

sole authority was limited to non-emergency medical care decisions. Likewise, it is unclear whether Mother may file an objection if she disagrees with Father's decisions. On remand, the trial court is instructed to clarify this issue for the parties.

## Father's Decision-Making Authority

Regardless of the need for clarification of the trial court's order, *see supra*, the record supports Father receiving either sole decision-making authority or tie-breaker authority. As discussed above, the record shows that the parties have been unable to make decisions jointly or to communicate and/or compromise with each other, and it is clear that these conflicts have negatively affected the Child on several occasions. Accordingly, it is in the Child's best interest that one parent receives decision-making authority so that the Child may live a more stable and conflict-free life. Father is the primary residential parent with the majority of parenting responsibilities, and he is the parent who is currently more involved in the Child's education and medical care. As such, it was well within the trial court's discretion to award Father authority over such decisions.

## The Child's Travel Arrangements

Concerning decisions regarding the Child's travel for visits, the Child testified that it is his preference to fly to Tennessee; however, Mother testified that she prefers to drive because she has not "been able to afford any plane tickets because . . . flying [the Child] in and out of Nashville is not affordable or feasible or reasonable." Mother, however, does not bear the entire cost of the Child's travel as the current plan requires the parties to split the costs. In view of the fact that the car ride from Michigan to Tennessee is no less than 16 hours round-trip, it is an undue burden for the Child to make this road trip for a three-day weekend with Mother in Tennessee. Indeed, the Child recognized this problem when he testified that he would prefer to fly "every single time" he visits Tennessee because "[f]lying is a whole lot better than driving in a car for eight hours a day and only getting to see her for sometimes [fifteen] hours and having to be in a car [ten] hours again." In view of the distance between Mother and Father's homes, the Child's preference, and the costs of air travel being split between the parties, we cannot conclude that the trial court erred in granting Father sole decision-making authority to arrange the Child's air travel to Tennessee.

## The Child's Health and Dental Insurance

Regarding the Child's health and dental insurance, Mother alleged that Father failed to list her health insurance as the Child's supplemental insurance; however, Father presented evidence showing that he had submitted Mother's insurance information to the Child's providers and that the providers had billed her insurance. Regardless, it is clear that the Child's insurance has been another source of constant disagreement between the parties. To quell these disagreements, it was not outside the trial court's discretion to charge

Father with providing insurance for the Child. This decision did not negatively affect Mother or her parental rights; it simply negated one source of conflict between the parties.

### c. Modification of Mother's Child Support Obligation

Mother contends that the trial court erred in modifying her child support obligation. Specifically, Mother argues that the trial court erred in calculating her gross income. "Because child support decisions retain an element of discretion, we review them using the deferential 'abuse of discretion' standard." **Richardson v. Spanos**, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). As discussed, *supra*, "[a]n abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." **Gonsewski v. Gonsewski**, 350 S.W.3d 99, 105 (Tenn. 2011) (citing **Wright ex rel. Wright v. Wright**, 337 S.W.3d 166, 176 (Tenn. 2011)).

The Tennessee Supreme Court has explained that "[a]wards of child support are governed by the Child Support Guidelines [(the "Guidelines")] promulgated by the Tennessee Department of Human Services Child Support Services Division." **Taylor v. Fezell**, 158 S.W.3d 352, 357 (Tenn. 2005) (citing Tenn. Code Ann. § 36-5-101(e)(2)).[5] Under the Guidelines, the *initial* inquiry in a petition for child support modification is whether "a significant variance exists." Tenn. Comp. R. & Regs. 1240-02-04-.05(2)(a); *see* **Wine v. Wine**, 245 S.W.3d 389, 393-94 (Tenn. Ct. App. 2007). Relevant here, "[a] significant variance is defined as at least fifteen percent (15%) difference in the current support obligation and the proposed support obligation." Tenn. Comp. R. & Regs. 1240-02-04-.05(2)(b); *see also* **Hill v. Hill**, No. E2019-02226-COA-R3-CV, 2021 WL 4745384, at *7 (Tenn. Ct. App. Oct. 12, 2021); *see also* Tenn. Code Ann. § 36-5-101(g)(1) ("Upon application of either party, the court shall decree an increase or decrease of support when there is found to be a significant variance[.]"). The party seeking to modify the child support obligation bears the burden of proving that a significant variance exists. **Hill**, 2021 WL 4745384, at *7 (citing **Tigart v. Tigart**, No. M2020-01146-COA-R3-CV, 2021 WL 4352539, at *4 (Tenn. Ct. App. Sept. 24, 2021)). Here, Father asked the trial court to modify Mother's child support obligation, thus, he had the burden of proving a significant variance at trial.

---

[5] We note that there have been three versions of the Guidelines in effect during the pendency of this case, but the May 10, 2020 version applies here. The 2020 Guidelines apply in "every judicial . . . action to . . . modify . . . child support . . ., whether the action is filed before or after the effective date of [the Guidelines], where a hearing which results in an order . . . modifying . . . support is held after the effective date of [the Guidelines]." Tenn. Comp. R. & Regs. 1240-02-04-.01(2)(a). Although Father filed his petition to modify on April 18, 2019, before the May 10, 2020 effective date, the trial court did not hear the issue of child support until the trial in September 2020. Because the hearing that resulted in an order modifying Mother's child support obligation occurred after the May 10, 2020 effective date, the 2020 Guidelines apply to this case.

Turning to the record, it appears that Father failed to argue or even allege that a significant variance existed. In his petition to modify, Father alleged that Mother failed to exercise some of her discretionary parenting time and that she quit her job. Based solely on these allegations, Father asked the trial court to modify child support "in accordance with the Tennessee Child Support Guidelines . . . ." Nowhere in the petition to modify does Father allege a significant variance that would allow for such modification. The record shows that Father failed to make any argument concerning a significant variance at trial, and the trial court's order is silent on the issue of significant variance. Indeed, the child support worksheet prepared by the trial court leaves the following sections blank:

13a Current child support order amount for the obligor parent
13b Amount required for significant variant to exist
13c Actual variance between current and presumptive child support orders

This Court has explained that, "[i]f the trial court misconstrues or misapplies the law, its discretion lacks the necessary legal foundation and becomes an abuse of discretion." *Gooding v. Gooding*, 477 S.W.3d 774, 779 (Tenn. Ct. App. 2015) (quoting *BIF, a Div. of Gen. Signals Controls, Inc. v. Serv. Const. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988)). The trial court's failure to consider whether a significant variance existed before modifying Mother's child support obligation constitutes an abuse of its discretion. *Gonsewski*, 350 S.W.3d at 105. Under certain circumstances, this Court has conducted a review of the record to determine whether a significant variance existed when the trial court failed to make such determination. *See Stacey v. Stacey*, No. 02A01-9802-CV-00050, 1999 WL 1097975, at *3 (Tenn. Ct. App. Oct. 6, 1999). However, for reasons discussed below, we decline to undertake this analysis based on the record in this case.

For context, we first observe the procedures trial courts must follow when determining a significant variance. As this Court has explained before,

to determine whether a significant variance existed, the trial court maintained the responsibility of calculating guideline child support utilizing the child support worksheets, pursuant to Tenn. Comp. R. & Regs. 1240-02-04-.04, and "current evidence of the parties' circumstances." *See* Tenn. Comp. R. & Regs. 1240-02-04-.05[(4)]; *see also **Murphy** [**v. State Child Support Servs.**, No. M2012-02514-COA-R3-JV, 2014 WL 1715092, at *6 (Tenn. Ct. App. Apr. 29, 2014)] ("The Guidelines mandate the use of Worksheets promulgated by the Department and the maintenance of the completed Worksheets 'as exhibits in the tribunal's files or as attachments to the order.'"). In calculating guideline child support, the court initially would be required to determine the parents' respective gross incomes . . . . *See **Smith** [v. **Smith**, No. M2003-02033-COA-R3-CV, 2005 WL 1384896, at *10 (Tenn. Ct. App. June 10, 2005)]. The court should incorporate its findings

concerning the parents' gross incomes into the worksheet, along with the number of co-parenting days awarded to each parent. *See* Tenn. Comp. R. & Regs. 1240-02-04-.04. Finally, the court should make adjustments for allowed additional expenses, such as health insurance premiums and work-related child care expenses. *See id.*; *see also* **Baker v. Baker**, No. M2020-00374-COA-R3-CV, 2021 WL 287845, at *3 (Tenn. Ct. App. Jan. 28, 2021).

Following these delineated steps results in the calculation of a current presumptive child support order. *See id.* When comparing the previously ordered child support to the current presumptive child support amount for the purpose of determining whether a significant variance exists, the court must []not include the amount of any previously ordered deviations or proposed deviations in the comparison.[] *See* Tenn. Comp. R. & Regs. 1240-02-04-.05(4); *see also* **Tigart**, 2021 WL 4352539, at *4.

**Hill**, 2021 WL 4745384, at *7-8.

As noted above, Mother takes issue with the trial court's determination of her gross income, a determination that is part and parcel of the significant variance analysis. The Guidelines provide that the "[g]ross income of each parent . . . shall include all income from any source . . . ." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(1). Relevant here, income may be *imputed* to, i.e., attributed to, a parent if the court determines that the parent is willfully underemployed or unemployed. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i)(I). In analyzing whether a parent is underemployed or unemployed, a court will "ascertain the reasons for the parent's occupational choices, [] assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren), and [] determine whether such choices benefit the children." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii). "A determination of willful underemployment or unemployment is not limited to choices motivated by an intent to avoid or reduce the payment of child support." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(I). The parent seeking to impute income to the other parent bears the burden of proving that the other parent is willfully underemployed. **Massey v. Casals**, 315 S.W.3d 788, 796 (Tenn. Ct. App. 2009).

As provided in the Guidelines, a court may consider, in pertinent part, the following factors when determining whether a parent is willfully underemployed or unemployed:

(I) The parent's past and present employment;

(II) The parent's education, training, and ability to work;

(III) The State of Tennessee recognizes the role of a stay-at-home parent as an important and valuable factor in a child's life. In considering whether

- 21 -

there should be any imputation of income to a stay-at-home parent, the tribunal shall consider:

I. Whether the parent acted in the role of full-time caretaker while the parents were living in the same household;
II. The length of time the parent staying at home has remained out of the workforce for this purpose; and
III. The age of the minor children.

***

(VII) Any additional factors deemed relevant to the particular circumstances of the case.

Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii).

If a court determines that a parent is willfully underemployed or unemployed, it may allocate additional income "to that parent to increase the parent's gross income to an amount which reflects the parent's income potential or earning capacity, and the increased amount shall be used for child support calculation purposes."  Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(II).  The Guidelines provide that a court *shall* use the following criteria when determining what additional income to allocate to the parent: (1) "[t]he parent's past and present employment; and (2) [t]he parent's education and training." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(II)(I-II).  If, when modifying an existing child support order, a court is not presented with "adequate and reliable evidence of income (such as tax returns for prior years, check stubs, or other information for determining *current ability to support*); and [t]he tribunal has no adequate and  reliable evidence of the [obligor] parent's income or income potential, [t]hen . . . the tribunal must take into consideration the specific circumstances of the parent to the extent known[.]" Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv)(II)(I-III) (emphasis added).  This includes, but is not limited to the following factors: residence; employment and earnings history; job skills; educational attainment; the local job market; the availability of employers willing to hire the parent[]; and the prevailing earnings level in the local community.  Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv)(II)(III).  Such finding of potential income is a question of fact that "must have an evidentiary basis." ***Eatherly v. Eatherly***, No. M2000-00886-COA-R3-CV, 2001 WL 468665, at *11 (Tenn. Ct. App. May 4, 2001).

Concerning Mother's employment, the trial court found:

13.  Although Mother did have a stable job with Ritchie Brothers Auctioneers and was doing very well as an employee, she left the job once she remarried in 2019.  Her employer testified that they would definitely rehire her again.

- 22 -

While working with Ritchie Brothers, she was making $42,996.95 annually. Although she worked briefly with the U.S. Census Bureau, she is currently unemployed. She is now a stay-at-home mother and wife. Since they currently live on a farm she helps with the farm work.

Concerning Mother's child support obligation, the trial court held:

4. That Mother is found to be underemployed. For child support purposes, her income will be imputed at the rate of her pay from Ritchie Brother's Auctioneers. Her monthly income will be set at $3,583.07. Father's monthly income is set at $7,873.87. Mother shall pay child support directly to Father in the amount of $366.00 per month to begin on December 1, 2020.

As an initial matter, it is unclear from her briefing whether Mother appeals the trial court's determination that she is underemployed. For completeness, we have reviewed the record and conclude that it supports the trial court's finding on this issue. According to the record, Mother has no limitations preventing her from maintaining employment, and she maintained consistent employment before marrying her husband. By Mother's own testimony, she and her husband "have chosen for [her] to not work." Mother asserts in her brief that "[i]t does not seem fair to penalize Mother for choosing to be a homemaker and stay at home mother." As noted above, "[t]he State of Tennessee recognizes the role of a stay-at-home parent as an important and valuable factor in a child's life." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii)(III). However, Mother is not the Child's primary residential parent and does not act as the Child's full-time caretaker. Furthermore, because she maintained consistent employment prior to marrying her husband, it appears that Mother's choice to leave the workforce is related more to her being a stay-at-home wife than a stay-at-home mother. As such, Mother's decision not to work does not constitute a valid reason to avoid her obligation to provide support for the Child. *See Ralston v. Ralston*, No. 01A01-9804-CV-00222, 1999 WL 562719, at *3 (Tenn. Ct. App. Aug. 3, 1999) (citing *Garfinkle v. Garfinkle*, 945 S.W.2d 744, 744 (Tenn. Ct. App. 1996)) ("[O]bligor parents will not be allowed to avoid or lessen their obligations to their children simply so that the parents can choose not to work or to work at lower-paying jobs."). Having affirmed the trial court's conclusion that Mother is underemployed, we turn to review whether the record supports the trial court's imputing $42,996.95 as Mother's gross income for child support purposes.

Concerning her previous employment, Mother testified that she worked for Ritchie Brother's, near her home in LaVergne, Tennessee, from 2016 until 2019. Mother's supervisor at Ritchie Brother's testified that the company is "the world's largest construction and industrial auctioneer," and that it "sell[s] heavy equipment and transportation." According to the record, Mother worked for the company for four years as an equipment inventory clerk, and she also helped with appraisals. Her supervisor testified that Mother was a hardworking employee and an asset to the company.

- 23 -

The record shows that Mother married her husband in February 2019 and moved to Cleveland, Tennessee in March 2019. Mother testified that she left her employment with Ritchie Brother's in March 2019 because the two-hour-and-fifteen-minute commute between Cleveland and La Vergne was too long. The record shows that, after moving to Cleveland, Mother obtained employment with Mid-South Equipment Company ("Mid-South Equipment"), in Chattanooga, where she worked in accounts payable and sales. It is unclear whether Mother was a full-time or part-time employee, what her wages were, or why she stopped working at Mid-South Equipment. At the time of trial, Mother worked part-time for the U.S. Census Bureau (the "Bureau"), but she testified that her employment with the Bureau would end when the census was complete, at the end of September 2020 (the same month of trial). Mother testified that she was not employed elsewhere, but that she spent "a lot of time" working on the family farm.

Trial Exhibit 21 includes Mother's 2018 W-2 Earnings Summary from Ritchie Brother's, showing gross income of $43,761.33 in 2018, which was the last year she was employed full-time. The exhibit also includes Mother's 2019 W-2 Earnings Summary for Ritchie Brother's, which showed earnings totaling $12,466.79 for that year. Lastly, the exhibit includes Mother's W-2 Wage and Tax Statement showing gross earnings from Mid-South Equipment in 2019 totaling $1,612.00. Mother also testified that she earned $18.00 per hour working part-time for the Bureau and that her hours varied. At trial, Mother never gave a direct answer concerning how many hours she worked for the Bureau. On this Court's review, this is the extent of the evidence presented to the trial court concerning Mother's income or her potential income. We briefly note that, although Father argues that Mother failed to present sufficient evidence concerning her income, as the party seeking to modify Mother's child support obligation and to deem her underemployed, it was *Father's* burden to prove Mother's potential income.[6] *Massey*, 315 S.W.3d at 796.

The foregoing evidence showed that, at the time of trial, Mother worked part-time, earning $18.00 per hour, but such employment would end in the coming weeks. Given that Mother's employment would end shortly after the trial concluded, it was not necessarily

---

[6] During Mother's direct examination, counsel for Father questioned Mother concerning Mother's failure to respond to discovery regarding her income. If Father believed that Mother's failure to respond to his discovery responses would affect the evidence presented at trial, he could have sought sanctions against her under the Tennessee Rules of Civil Procedure. *See generally* Tenn. R. Civ. P. 37. We note that, on the first day of trial, the trial court addressed a motion Father apparently filed concerning Mother's failure to respond to discovery. Although this motion is absent from our technical record, at trial, Father's counsel argued that "[t]he gist of [the] motion is that Mother has not fully answered her discovery, and [Father is] asking [the trial court] to limit evidence and testimony if [Mother] didn't put [Father] on notice of information prior to trial." Father's counsel then stated that she would "generally be objecting to information [Mother was] trying to elicit or arguments [Mother was] trying to make that were not previously disclosed." The trial court stated that it would take up such issues as they arose during trial. It does not appear from the trial transcript that Father ever lodged an objection concerning Mother's income or potential income.

error for the trial court to consider Mother's employment and earnings history when imputing income to her. *See* Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv)(II). However, it was error for the trial court to impute income based on Mother's previous earnings from Ritchie Brother's without making additional relevant findings to support imputation of that amount. While the record shows that Mother earned $43,761.33 during her employment with Ritchie Brother's in 2018, the record is silent as to whether Mother could earn a similar wage in her current city. As discussed, *supra*, Ritchie Brother's is located in La Vergne, Tennessee—a community that is over two hours away from Mother's current residence in Cleveland, Tennessee. Under the Guidelines, the trial court should have considered Mother's residence, job skills, the local job market in Cleveland, the availability of employers willing to hire Mother, and the prevailing earnings level in Cleveland when determining the amount of income to impute. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv)(II)(III). The trial court made no findings, and, on this Court's review, no evidence was presented, concerning these factors. In short, there was no evidence presented to show that Mother could earn a wage, while living in Cleveland, similar to what she earned at Ritchie Brother's, when she lived in La Vergne. Although the record shows that Mid-South Equipment, where Mother was briefly employed in 2019, might be a company comparable to Ritchie Brother's, there was no evidence concerning whether Mother could obtain full-time employment there or the yearly income she could earn with that company.

In her motion to alter or amend, Mother argues that Mid-South Equipment was an "industry equivalent" job to Ritchie Brother's that was located in her current community. She further argues that: (1) she made $12 per hour at Mid-South Equipment; (2) she worked 40 hours per week at such job; and (3) her monthly income was $2,080.00. Mother asks this Court to use $2,080.00 as her gross monthly income for purposes of calculating her child support obligation. Problematically, it appears that this information was never presented as evidence during trial. We also note that, in footnote 3 of her appellate brief, Mother states that she is currently employed at the Cleveland Public Library. However, this information was not presented in the trial court. As discussed, *supra*, the only facts this Court may consider on appeal are those "established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to rule 14." Tenn. R. App. P. 13(c).

On our review of the record, we conclude that the trial court failed to conduct a significant variance analysis before modifying Mother's child support obligation and also imputed gross income to Mother that was not supported by the record. Given these issues, we vacate the trial court's modification of Mother's child support obligation and remand the question to the trial court for reconsideration. On remand, the trial court is not precluded from reopening proof on the question of the parties' current employment/income or potential income.

## B. Father's Request for Appellate Attorney's Fees

Father asks this Court to award him attorney's fees incurred in defending this appeal. In Tennessee, "litigants are responsible for their own attorney's fees absent a statute or agreement between the parties providing otherwise." *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005) (citing *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000)). Father argues that Tennessee Code Annotated section 36-5-103(c) allows him to recover his attorney's fees. In pertinent part, this section provides that "[a] prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any . . . proceeding to . . . modify . . . a permanent parenting plan[.]" Tenn. Code Ann. § 36-5-103(c). As Father notes in his brief, such an award is within the sound discretion of this Court. *In re C.W.*, 420 S.W.3d 13, 22 (Tenn. Ct. App. 2013) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). "In considering a request for attorney's fees on appeal, we consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case." *In re C.W.*, 420 S.W.3d at 22 (citing *Darvarmanesh*, 2005 WL 1684050, at *16). Here, Father is in a better position to pay his own attorney's fees. Furthermore, Father has not been wholly successful in this appeal, as we have vacated the trial court's modification of Mother's child support obligation. As such, we exercise our discretion to deny Father's request for appellate attorney's fees and costs.

## VI. Conclusion

For the foregoing reasons, we vacate the trial court's modification of Mother's child support obligation and remand with instructions consistent with this Opinion. The trial court's order is otherwise affirmed. Father's motion for appellate attorney's fees is denied, and the case is remanded for such further proceedings as are necessary and consistent with this Opinion. Costs of the appeal are assessed one-half to the Appellant, Elizabeth M., and one-half to the Appellee, Jonathan S., for all of which execution may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE
