**BRUNSWICK ACCEPTANCE COMPANY, LLC**

**v.**

**MEJ, LLC, et al.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

April 24, 2008 Session.

Oct. 21, 2008.

Permission to Appeal Denied by Supreme Court April 27, 2009.

Michael L. Powell, Knoxville, Tennessee, for the Appellants, MEJ, LLC, and Mitchell E. Jones.

Buffey Klein, Memphis, Tennessee, for the Appellee, Brunswick Acceptance Company, LLC.

## OPINION

SHARON G. LEE, SP. J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

This case arises out of the financing and subsequent repossession of several boats. After the debtor defaulted and surrendered the collateral boats, the creditor sent written notification via multiple emails to the debtor, notifying the debtor of its plan to sell the boats at private sale. Following the sale of the collateral boats, the creditor filed this action seeking a deficiency judgment for the remaining amount owed by the debtor. The trial court held that the creditor's provision of notice was sufficient and that the sales of the boats were conducted in a commercially reasonable manner under the Uniform Commercial Code ("UCC") and awarded the creditor a deficiency judgment in the amount of $160,879 plus post-judgment in-

terest and $30,000 in attorney's fees. The debtor raises the issues of whether the notice provided by the creditor was sufficient under the UCC and whether the trial court erred in awarding attorney's fees. We hold that the evidence does not preponderate against the trial court's conclusions that the creditor acted in a commercially reasonable manner regarding all aspects of the sales of the collateral boats, including providing the debtor sufficient notice under the circumstances presented here, and consequently affirm the judgment of the trial court, including its award of attorney's fees.

## I. Background

On December 12, 2003, Brunswick Acceptance Company, LLC ("BAC") executed an inventory security agreement with MEJ, LLC ("MEJ") whereby BAC agreed to extend credit to MEJ for the purchase of watercraft and accessories from Brunswick Boat Group ("BBG"). Mitchell E. Jones, the sole owner of MEJ, signed a guaranty providing for an "unconditional guarantee [of] the full and punctual payment and performance" of MEJ's obligations to BAC. On April 25, 2005, BAC performed an inventory check and found that MEJ was short on its inventory under the following provision of the inventory security agreement:

> [MEJ] shall pay BAC the amount of any Advance made to finance the acquisition of any item of inventory immediately upon the earlier of ... the sale of such item, and shall hold the entire sale proceeds therefore IN TRUST for BAC until paid to BAC, and upon request from BAC, in the same for as received, separate and apart from [MEJ]'s other funds and property.

Unable to render the principal payment on four boats that had been previously sold, MEJ surrendered its inventory to BAC in a letter dated June 30, 2005. On July 15, 2005, BAC gave notice of default and acceleration of the balance due under the inventory security agreement to MEJ and guarantor Mr. Jones.

In late July of 2005, Allen McDonald (BBG's counsel), representatives of BAC, and representatives of Brunswick Family Boat Company, Inc., held a meeting with Mr. Jones and Chris Martin (counsel for MEJ and Mr. Jones), to discuss how to deal with the default and collateral. At that meeting, the parties agreed that further communication regarding the sales of the collateral boats would take place between attorneys McDonald and Martin. On July 28, 2005, Mr. McDonald sent an email, including an attached letter to be sent to BBG's dealers for remarketing of the collateral boats, to Mr. Martin, stating as follows:

> Subject: Letter to U.S. Marine dealers re availability of Choto boats for purchase
>
> Chris,
>
> per our discussion of yesterday, attached is a draft letter.
>
> please review with your client, and give me your thoughts.
>
> as discussed, I'd like your buy-in to selling to our dealers versus a UCC auction.

The attached letter is dated July 26, 2005 and states in part:

**Mid–Atlantic Dealers**

> The following list of boats is available for special purchase. These boats were formerly owned by a local dealer in my territory. I have listed the models, dealer invoice, and condition of the boats offered.
>
> Please review each model and advise me of any interest you may have. US Marine will entertain any reasonable offer. While all boats have been inspected, if any parts are found to be missing or

damaged, these will be repaired or re-placed by U.S. Marine. All boats will come with our standard warranty.

The attachment then lists the seven boats surrendered by MEJ and details the condition of each. The descriptions of the boats in the letter were written by James David Sutton, the regional sales manager for U.S. Marine. Mr. Sutton emailed and faxed the letter to approximately 40 dealers in his territory. Three boats surrendered by MEJ were later repurchased by BBG and were not at issue during trial. The remaining four boats were a 30–foot Bayliner, a 27–foot Maxum, a 42–foot Maxum, and a 31–foot Maxum.

On July 29, 2005, Mr. McDonald sent Mr. Martin an email stating, among other things, that "we are willing to keep you reasonably apprised of the offers—and if Mr. Jones wants to try to find buyers in the meantime, we welcome his efforts." On August 15, 2005, Mr. McDonald sent an email to Mr. Martin regarding the 30–foot Bayliner and the 27–foot Maxum, stating the following:

We have received offers on the 2 boats identified below. These offers are more than we expected (we expected a 25% discount on the 2004 models), and I suggest we move forward. We must act quickly however because the dealer's offer is conditioned upon these boats being delivered and ready for sale in time for an end of the season sales event.

Please let me know your position.

On August 18, 2005, Mr. Martin responded with an email to Mr. McDonald stating in part as follows:

Mitch Jones has agreed that the pricing for the two boats itemized below represents a fair liquidation value. He will not agree that he[,] or any companies he is an officer of[,] owe any deficiency balance. My clients' agreement for these two boats should not be construed

as any agreement for the liquidation of any. other boats.

On September 4, 2005, Mr. McDonald sent an email to Mr. Martin stating that the sale of the two boats specified in the August 15, 2005 email had fallen through due to a misunderstanding regarding additional rebates and advising Mr. Martin that "we are going to [continue to] seek offers, including re-opening discussions with the interested dealer." Eleven months later on June 26, 2006, these two boats were sold to another dealer. The 30–foot Bayliner was sold for approximately $56,708, resulting in a deficiency of $30,535, and the 27–foot Maxum was sold for $37,835, resulting in a deficiency of $20,372.

On November 10, 2005, Mr. McDonald sent Mr. Martin an email stating in pertinent part:

We have a sale lined up on another boat.

The 31′ Maxum will be sold for $66,324.00. This is one of the boats not repurchased by Brunswick Boat Group; however, BBG has been involved in the remarketing [of] this boat and the others for Brunswick Acceptance Corp.

This amount is in line with the projections given to you and your client in July. I think the projected sales price was $67,824.

The 31–foot Maxum had an original invoice price of $90,432 and in November of 2005, was sold by BAC to a dealer for $66,324.

On February 1, 2006, Mr. McDonald sent Mr. Martin an email regarding the remaining boat, the 42–foot Maxum, stating in pertinent part:

Chris, as we discussed a couple of weeks [ago] or so, we have an offer on the 42 Maxum. As I recall, the price we discussed was $200,000–$205,000.

We are fairly confident the boat will sell for a net price of $210,000; we are still negotiating how the repairs will be handled, but either way the net is expected to be $210,000.

The 42–foot Maxum had an original invoice price of $271,200 and was sold in April of 2006 for $210,000, resulting in a deficiency of $61,200.

Following a bench trial, the trial court held that private sale was the most reasonable method of disposition and that even though BAC did not give the technical notice described in Tenn.Code Ann. § 47–9–613, the notice provided by BAC was more than sufficient and that the sales of the collateral boats were done in a commercially reasonable manner. Based on Mr. Martin's August 18, 2005 response to Mr. McDonald's email notifications, the trial court held that Mr. Jones had actual notice of method of disposition. The deficiency judgment awarded to BAC, reflecting the remaining amount of indebtedness owed by MEJ pursuant to the inventory security agreement after the sale of collateral, totaled $160,879 plus post-judgment interest. The trial court further held that BAC was entitled to attorney's fees in the amount of $30,000. MEJ appeals.

## II. Issues

We address the following issues:

1. Whether the trial court erred in finding that BAC's notice of sale of the collateral was sufficient and reasonable.

2. Whether the trial court erred in awarding BAC attorney's fees.

3. Whether BAC is entitled to attorney's fees incurred on appeal.

## III. Analysis

### A. Standard of Review

In a non-jury case such as this one, we review the record de novo with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless the evidence preponderates to the contrary. Tenn. R.App. P. 13(d); *Union Carbide v. Huddleston*, 854 S.W.2d 87, 91 (Tenn.1993). When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn.1999). The trial court's conclusions of law are reviewed de novo and are accorded no presumption of correctness. *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 35 (Tenn.1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn.1993).

### B. Notice

Tennessee has adopted Article 9 of the Uniform Commercial Code, codified at Tenn.Code Ann. §§ 47–9–101 through 47–9–709, to govern secured transactions. *See Auto Credit of Nashville v. Wimmer*, 231 S.W.3d 896 (Tenn.2007). Addressing the requirements of Article 9, the Tennessee Supreme Court in *Wimmer* stated as follows:

Article 9 provides a comprehensive statutory framework governing the secured transaction process, from how a creditor perfects its security interest to how it forecloses on that interest. After default, a secured party may take possession of the collateral and may sell or otherwise dispose of it. Tenn.Code Ann. § 47–9–610(a) (2001). In so doing, "[e]very aspect of [the] disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Tenn.Code Ann. § 47–9–610(b) (2001).

A debtor may recover damages against a creditor who fails to comply with the provisions of Article 9 governing repossession and disposition of collateral. Tenn.Code Ann. § 47–9–625(c)(2) (2001). *Wimmer*, 231 S.W.3d at 899–900. In addition, Tenn.Code Ann. § 47–9–610(b) states that a secured party may dispose of the collateral by public or private sale. Tennessee Code Annotated § 47–9–611 further provides in pertinent part:

(b) NOTIFICATION OF DISPOSITION REQUIRED. Except as otherwise provided in subsection (d), a secured party that disposes of collateral under § 47–9–610 shall send to the persons specified in subsection (c) a reasonable authenticated notification of disposition.

(c) PERSONS TO BE NOTIFIED. To comply with subsection (b), the secured party shall send an authenticated notification of disposition to:

(1) The debtor [and]

(2) any secondary obligor . . . .

Tenn.Code Ann. § 47–9–611. The official comment to Tenn.Code Ann. § 47–9–611(b) provides that "[t]he notification must be reasonable as to the manner in which it is sent, its timeliness (i.e., a reasonable time before the disposition is to take place), and its content." Tenn.Code Ann. § 47–9–611, cmt. 2. This Court has previously set forth the policy justification of requiring notice of sale to the debtor before the disposition of collateral by a secured party:

We think the provision for notice in connection with a sale is intended to afford the debtor a reasonable opportunity (1) to avoid a sale altogether by discharging the debt and redeeming the collateral or (2) in case of sale, to see that the collateral brings a fair price. A notice that does not afford him this reasonable opportunity is not reasonable notification and a sale under it is not commercially reasonable. *See Mallicoat v. Volunteer Finance & Loan Corp.*, 57 Tenn.App. 106, 415 S.W.2d 347 (1966). In our opinion the rule applies whether the claim in the initial notice was deficient or, if good initially, it ceased to be effective because of time and circumstances. The inquiry in either case is whether the debtor was afforded a reasonable opportunity (1) to redeem or (2) to protect his interest at the sale.

*Int'l Harvester Credit Corp. v. Ingram*, 619 S.W.2d 134, 137 (Tenn.Ct.App.1981); *see Fed. Exp. Credit Union v. Lanier*, No. W2005–00194–COA–R3–CV, 2005 WL 2806638, at *3 (Tenn.Ct.App. W.S., filed Oct. 27, 2005).

■ MEJ argues that notification was not sufficient because the notification did not comply with Tenn.Code Ann. § 47–9–613(1), which states:

The contents of a notification of disposition are sufficient if the notification:

(A) describes the debtor and the secured party;

(B) describes the collateral that is the subject of the intended disposition;

(C) states the method of intended disposition;

(D) states that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting; and

(E) states the time and place of a public disposition or the time after which any other disposition is to be made.

Tenn.Code Ann. § 47–9–613. Specifically, MEJ argues that notice was insufficient under this statute because (1) notice was sent to MEJ's counsel, rather than directly to MEJ; (2) BBG sent the notification, rather than BAC; (3) the notification does not include a time after which disposition

would be made; (4) the notification did not provide MEJ with the opportunity to find an alternative buyer; (5) the September 4, 2005 email notification concerning the 30–foot Bayliner and the 27–foot Maxum was insufficient because that particular sale was not completed; and (6) the emails do not describe the debtor or the secured party or state that the debtor is entitled to an accounting of the unpaid indebtedness. Tennessee Code Annotated § 47–9–613(2), however, states: "Whether the contents of a notification that lacks any of the information specified in paragraph (1) are nevertheless sufficient is a question of fact," and the official comment to Tenn.Code Ann. § 47–9–613 provides that "[a] notification that lacks some of the information set forth in paragraph (1) *nevertheless may be sufficient if found to be reasonable by the trier of fact,* under paragraph (2)." (Emphasis added).

In its findings of fact and conclusions of law, the trial court stated that even though BAC did not give the technical notice described in Tenn.Code Ann. § 47–9–613, the notice provided by BAC was more than sufficient and that the dispositions of the boats were commercially reasonable. In addition, the trial court held that Mr. Jones had actual notice of the dispositions as evidenced by Mr. Martin's August 18, 2005 email, which provided that Mr. Jones agreed that the sales of the 30–foot Bayliner and the 27–foot Maxum were commercially reasonable: "Mitch Jones has agreed that the pricing for the two boats itemized below represents a fair liquidation value."

Our review of the record confirms the trial court's judgment that Mr. Jones had actual notice of the disposition through a series of email notifications from Mr. McDonald, and that Mr. Jones had ample opportunity to look for competitive offers. Mr. Martin's email of July 28, 2005 demonstrates that Mr. Jones, the sole owner of

MEJ and guarantor, was aware that BAC would be offering the collateral at private sale. In addition, prior to the sales of the 31–foot Maxum and the 42–foot Maxum, MEJ received notification of the actual sales of each boat, including the price for which they would be sold. Regarding the sale of the 30–foot Bayliner and the 27–foot Maxum, Mr. Martin was sent an email on August 15, 2005, concerning the sale to a dealer that later fell through due to a misunderstanding. The boats were subsequently sold to another dealer. Even though MEJ was not given notice of the second sale, the first two notifications were sufficient under these circumstances. Once a notice of a private sale has been provided to the debtor, a second notice is unnecessary even if there "has been a substantial delay before the actual sale was made, because the notice of the private sale is only required to specify a date after which the collateral will be sold at private sale." 10 Ronald A. Anderson, *Anderson on the Uniform Commercial Code: Delayed Private Sale* § 9–504:524 (3rd ed. 1999). This notification gave MEJ an opportunity to provide alternative buyers for the products or to object to the sale of each boat, which it did not do. The first sale occurred four months after BAC provided the July 28, 2005 notification and five months after MEJ voluntarily surrendered the collateral, and thus MEJ had ample time to seek alternative buyers for the surrendered collateral boats.

We find no merit in MEJ's argument that notification was not reasonable because counsel for BBG, rather than BAC, sent the notification to MEJ's counsel, rather than to MEJ and Mr. Jones. The record contains uncontroverted testimony that representatives of BAC and BBG met with Mr. Jones and Mr. Martin prior to the July 18, 2005 email notification to discuss the disposition of the collateral and the remaining balance on the loan, and

that at the meeting the parties agreed that further communication would be between Mr. McDonald and Mr. Martin, who is counsel for MEJ and Mr. Jones. Further, Mr. Martin's response to the July 18, 2005 email shows that Mr. Martin discussed the notification of disposition with Mr. Jones. Mr. Martin's response also indicates that Mr. Jones approved a private sale of a boat for the invoice price. Due to the nature of the collateral, the immediate advertising of the boats for sale was in MEJ's best interest, and MEJ had an opportunity to review the letter to be sent to dealers for private sale prior to the remarketing of the collateral. In addition, the attached letter to the July 28, 2005 email provided the date of July 26, 2005, indicating that BBG intended to remarket the boats immediately. Mr. Martin's response of July 28, 2008 lists no objection to the immediate remarketing of the boats, and because the surrender occurred toward the end of the 2005 boating season, all testimony stressed the importance of selling the boats in the earlier season to avoid the boats being considered an additional year older, which would reduce the market value of the boats.

Additionally, at trial the secured creditor BAC's witnesses testified that the boats were resold at a fair and commercially reasonable price under the circumstances, and MEJ presented no proof to the contrary. MEJ did not contend at trial, nor has it argued on appeal, that the sales prices of the surrendered collateral boats obtained by BAC were commercially unreasonable or that the prices did not reflect fair market value. This Court has previously noted that "[a]lthough the [UCC] is careful to point out that a creditor's failure to procure the maximum possible price for collateral does not in and of itself make a sale commercially unreasonable, a sufficient resale price *is* the logical focus of the protection given debtors by

these sections." *Smith v. Daniels*, 634 S.W.2d 276, 278 (Tenn.Ct.App.1982) (emphasis in original); *First Tenn. Bank Nat'l Ass'n v. Helton*, No. 03A01–9501–CV–00026, 1995 WL 515658, at *3 (Tenn.Ct. App. E.S., filed Aug. 31, 1995); *see also Trimble v. Sonitrol of Memphis, Inc.*, 723 S.W.2d 633, 643 (Tenn.Ct.App.1986) (stating "the [debtors] did not put on any credible proof that the [collateral] dealership was sold for less than the fair market value, and therefore, they can claim no damages.").

■ MEJ also argues that BAC did not provide sufficient notification regarding the three boats that were repurchased by BBG. However, this issue was not raised at trial, and it is well-settled that an issue not raised in the trial court will not be entertained on appeal. *In re Adoption of E.N.R.*, 42 S.W.3d 26, 32 (Tenn.2001). Accordingly, MEJ's argument as to this issue has been waived.

Based on our review of the record as discussed above, we hold that the evidence does not preponderate against the trial court's conclusions that BAC provided adequate notice to MEJ under the circumstances and that the resales of the collateral boats were conducted in a commercially reasonable manner, and therefore the debtor MEJ was afforded the protections required under the UCC in this case.

### C. Trial Court's Award of Attorney's Fees

■■ Finally, MEJ contends that the trial court erred in awarding BAC attorney's fees in the amount of $30,000 pursuant to the inventory security agreement, which provides that:

> Dealer shall pay to BAC on demand all reasonable attorneys' fees and legal expenses and other costs and expenses incurred by BAC in connection with es-

tablishing, perfecting, maintaining perfection of, protecting and enforcing its Lien in the Collateral and collecting indebtedness, or in connection with any modification of the Agreement, and Default or in connection with any action or proceeding under any bankruptcy or insolvency laws.

"The allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion." *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn.2005) (quoting *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn.1995)). BAC's attorney submitted a copy of a bill showing total fees of $59,922.43. In determining a reasonable fee amount, the trial court should look to the guidelines outlined in *Connors v. Connors*, 594 S.W.2d 672, 676 (Tenn.1980) and to the factors listed in Tennessee Supreme Court Rule 8, RPC 1.5. *Kline v. Eyrich*, 69 S.W.3d 197, 209 (Tenn.2002).

The *Kline* Court observed that "the *Connors* guidelines include the time devoted to performing the legal service; the time limitations imposed by the circumstances; the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly; the fee customarily charged in the locality for similar legal services; the amount involved and the results obtained; and the experience, reputation, and ability of the lawyer performing the legal service." *Kline*, 69 S.W.3d at 209, n. 11. Tennessee Supreme Court Rule 8, RPC 1.5 provides for similar, though not identical, factors as follows:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) whether the fee agreement is in writing.

Tenn. Sup.Ct. R. 8, RPC 1.5(a).

Applying these factors to the present case, we do not find that the trial court abused its discretion in awarding attorney's fees to BAC in the amount of $30,000. This case involved a lengthy process of disposition of collateral, negotiation for settlement, and bench trial. The fee awarded was reasonable under the circumstances presented here.

### D. Attorney's Fees on Appeal

■ BAC requests its attorney's fees associated with the costs of this appeal. The inventory security agreement requires MEJ to pay all costs and expenses, including reasonable attorney's fees, incurred in enforcing the agreement. In *Robinette v. Johnson*, we held that a contract that generally allowed for "attorney fees and costs of collection" in the event of default includes attorney's fees on appeal. *Robinette v. Johnson*, No. M2000–01514–COA–R3–CV, 2001 WL 694477, *3 (Tenn.Ct.App. M.S., filed June 21, 2001). Accordingly,

BAC is entitled to its reasonable attorney's fees and costs incurred on appeal, and we remand this case to the trial court for a determination of this amount.

### IV. Conclusion

For the foregoing reasons, the judgment of the Circuit Court is affirmed, and this case is remanded to the trial court for a determination of attorney's fees on appeal.

Costs of appeal are assessed equally to the Appellants, MEJ, LLC, and Mitchell E. Jones.