IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 5, 2025 Session

## MARK LAVON FORD v. APRIL CORRINE FORD

**Appeal from the General Sessions Court for Jackson County**
**No. 20-DV-57        Tiffany Gentry Gipson, Judge**

_____

**No. M2023-01762-COA-R3-CV**

_____

This appeal arises from a divorce with minor children. Appellant/Mother appeals the trial court's designation of Appellee/Father as the primary residential parent of the parties' youngest children. Discerning no error, we affirm. Both parties request awards of appellate attorney's fees, which are denied.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the General Sessions Court
Affirmed and Remanded**

VALERIE L. SMITH, J., delivered the opinion of the court, in which ANDY D. BENNETT and JEFFREY USMAN, JJ., joined.

Karla C. Miller, Nashville, Tennessee, for the appellant, April Corrine Ford.

Kelsy A. Miller, Cookeville, Tennessee, for the appellee, Mark Lavon Ford.[1]

**OPINION**

## I. Background

On April 17, 1999, Appellant April Corrine Ford ("Mother") and Appellee Mark Lavon Ford ("Father") married. Eight children were born to the marriage: Jacob (d/o/b November 2001); Bradden (d/o/b April 2003); Hannah (d/o/b November 2004); Thaniel (d/o/b August 2006); Trineesha (d/o/b May 2008); Candace (d/o/b June 2011); Zyana (d/o/b July 2016); and Chayton (d/o/b July 2019).[2] Father worked outside the home to

_____

[1] The Guardian Ad Litem for the children did not file an appellate brief.
[2] During the pendency of the divorce, Jacob and Bradden attained the age of majority. Accordingly, orders concerning the children throughout the divorce pertain only to the six younger children.

support the family financially and, at one time, worked as a pastor at the family's church. Mother was a stay-at-home mother, primary caregiver to the children, and homeschooled the older children. In late 2020, Father began an affair with Penny Pufahl, and he lived with her and her two children during the pendency of the divorce, discussed *infra*. As discussed further below, Jacob, Bradden, Hannah, Thaniel, and Trineesha (together, the "older children") struggled with Father's infidelity, became resentful and fearful of him, and sided with Mother during the divorce. This resulted in Father's relationship with the older children deteriorating and the older children becoming negative influences on Father's relationship with Candace, Zyana, and Chayton (together, the "younger children").

On November 2, 2020, Father filed a complaint for divorce in the General Sessions Court for Jackson County, Tennessee ("trial court"). On November 7, 2020, the trial court held a hearing concerning a temporary parenting plan where the parties announced an agreement regarding visitation. Although an order confirming this agreement was not entered until April 26, 2021, the parties followed this schedule for some time before the order was filed. Relevant here, the order provided that Father would visit the children every Saturday from 10:00 a.m. until 6:00 p.m. The order also provided:

> 7. [Father] shall have no physical contact with any of the children without the consent of the child.
>
> 8. The parties shall not say [] derogatory remarks about the other parent.
>
> 9. The parties shall not discuss any "adult issues" with or in front of the children and the children shall not be consulted with as "buddies."
>
> 10. No one other than family members are to be present during visitation.
>
> 11. Mother shall encourage the children to attend visitation and shall facilitate a quality visit with Father.

On March 4, 2021, Mother filed an answer and counter complaint for divorce. On April 22, 2021, Father filed an answer to the counter complaint.

By order of June 22, 2021, the trial court entered an agreed order requiring the parties to participate in counseling with Andrea Chase, M.S., J.D. The order provided that "[c]ounseling [would] be in a manner that the counselor deems would best serve the family's needs whether group or individual counseling."

On April 22, 2022, the trial court entered a second agreed order concerning visitation. This order provided that the younger children (Candace (10), Zyana (5), and Chayton (2)) would have visitation with Father separate from the older children (Hannah

(17), Thaniel (15), and Trineesha (13)). The order also provided that, at the exchange for the three younger children, Mother would escort the younger children out of the marital residence and the three older children would remain in the home until Father left with the three younger children. The order further directed the parties to minimize conflict between Father and the older children, especially in front of the younger children, and ordered the older children to meet individually with Ms. Chase, the counselor. Mother was ordered to schedule these appointments. In short, the trial court's order directed the parties to work together "to make sure the three younger children are protected and shielded from the older children's anger towards Father." Lastly, the order directed that, any modification of the order should be discussed with the counselor "and new recommendations [should] be put in writing and submitted to the [trial c]ourt for approval."

In July 2022, Father filed a motion for counseling status, to waive mediation and set final hearing, and for a psychological evaluation pursuant to Rule 35 of the Tennessee Rules of Civil Procedure. Around this time, Mother filed an order of protection and motion for a guardian *ad litem* ("GAL"). Concerning the order of protection, it was drafted by Bradden, one of the older children who had reached majority, rather than Mother's legal counsel, and Mother signed and filed it. The order of protection was entered *ex parte* and caused Father to miss parenting time with the children. The trial court heard the remaining motions on July 26, 2022.[3]

On September 12, 2022, the trial court entered an agreed order allowing Father to visit with the children in the home he shared with Ms. Pufahl. The order also provided that the children were permitted to be around Ms. Pufahl.

On September 27, 2022, the trial court entered an order from the July 26, 2022, hearing. First, the trial court found that this was one of the worst cases of parental alienation the trial court had seen and that there had been multiple violations of court orders. Specifically, the trial court found that Mother and Bradden "substituted their judgment for the judgment and orders of the [c]ourt" when they drafted and filed the order of protection." Concerning the order of protection, the trial court found that the allegations did not give rise to an order of protection and noted that Father missed visitation with the children due to the *ex parte* entry of that order. The trial court further found that there was a concerted effort from Mother and the older children to shield the younger children from Father. The trial court referenced two recordings that it found disturbing.[4] First, the trial court discussed a "huddle" video, which the trial court described as "almost cult-like" wherein the older children physically huddled around the younger children to "shield" them from Father and "to make the [younger] children feel as if there is something wrong with

---

[3] Neither the order of protection nor the motion for a GAL appear in the appellate record. Similarly, there is no transcript for this Court to review of the proceedings on July 26, 2022.

[4] Although neither of the recordings appear in the appellate record, the parties referenced them in their testimony at trial and in their appellate briefs. Accordingly, it appears that neither party disputes the veracity of these recordings.

- 3 -

their Father." The second recording was an audio recording of Mother telling Father that she would put any toys he brought for the children onto the street. The trial court found that this behavior demonstrated to the younger children that they should fear Father. The trial court reiterated that the parties were to comply with the trial court's previous orders concerning counseling for the older children and that the younger children were to have visitation with Father without the older children. Because some of the older children did not want to be hugged or embraced by Father, he was ordered to work with them in counseling regarding whether the children wanted any physical affection from him. Father was also ordered not to threaten the children with corporal punishment. In this order, the trial court also appointed a GAL for the children. Lastly, the trial court stated:

> 19. [Mother] is admonished that the alienating behavior in which she and the older children [are] engaged is a factor that the [c]ourt is required by law to consider at a final hearing as to where the children will spend their time. In the event this situation does not improve, it will be very likely these children will go live with their Father. [Mother] will either facilitate a healthy relationship with these children and their Father, or they will live with him full time where he can do that on a more consistent basis.

On February 21, 2023, the trial court entered a bifurcated decree of divorce, wherein it granted the parties a divorce but reserved for a final hearing all issues regarding property division, debts, and the children.

On March 1, 2023, the trial court held a hearing on the GAL's motion for emergency review hearing.[5] By order entered March 24, 2023 (the "Temporary Order"), the trial court ordered the Tennessee Department of Children's Services ("DCS") to conduct evaluations of the parties' homes, to provide crisis intervention or support services for the children, and to coordinate a speech and educational assessment of the children. The trial court also ordered that the older children continue to see Ms. Chase if her case load allowed. If not, the trial court ordered the children to see another counselor at least twice per month and ordered the parties to adhere to the counselor's advice. The trial court's order also provided:

> 6. The [c]ourt remains very concerned about the parental alienation that is being [] conducted by [] Mother and the [older] siblings. They are continuing to influence the youngest children. The [c]ourt finds, based on what the [c]ourt has heard today, that this rises to the level of what the [c]ourt considers emotional abuse. The youngest children are in danger of immediate and irreparable harm if this situation does not change drastically. This is based on what the [c]ourt heard regarding continuation [of] alienating behaviors, concerns about the children's needs related to speech and

---

[5] Neither this motion nor a transcript from this hearing appear in the appellate record.

- 4 -

education, and concerns surrounding hygiene.

7. [] Father is therefore awarded temporary physical and legal custody of the youngest two children, Z[]yana and Chayton. Visitation with [] Mother and the siblings will coordinate with the other children, meaning that they will remain with Father on weekends that Father has visitation with the older children, and they will return to their Mother on the alternate weekends when the older children are with her.

8. Father will have sole decision making as it relates to the two youngest children regarding education, religious upbringing, non-emergency medical care, and extracurricular activities. Father and Mother will have joint decision making regarding the other three remaining minor children. This means that Father has equal right to make these decisions[] and must be consulted prior to any decisions being made.

On August 8, 2023, the trial court held the final hearing. The following witnesses testified: (1) Father; (2) Mother; (3) Kelly McCormack, the DCS caseworker; (4) Reesha Leone, a neighbor; and (5) Sherry Gilreath, a family friend. No exhibits were entered into evidence. The three older minor children, Thaniel, Trineesha, and Candace, testified in chambers without a court reporter present.[6]

On November 14, 2023, the trial court entered an order from the final hearing. The trial court found both parties' testimony credible. The trial court reviewed and made extensive findings concerning the factors in Tennessee Code Annotated section 36-6-106 before it designated Mother the primary residential parent of the three older minor children (Thaniel (17), Trineesha (15), and Candace (12)) and Father the primary residential parent of the two youngest children, Zyana (7) and Chayton (4) (together, the "youngest children").[7] Concerning the youngest children, Mother was awarded parenting time from Thursdays after school until Monday morning, on alternating weekends. The following week, Mother would have parenting time Thursday after school until Friday morning. This resulted in Mother being awarded 124 days of parenting time with the youngest children compared to Father's 241 days. Father was awarded alternating weekends with the older children. The trial court also ordered that the older children continue in counseling until discharged by the counselor and ordered the entire family to participate in counseling.

Mother filed a timely notice of appeal.

---

[6] At the time of the final hearing, Hannah had reached the age of majority.
[7] In its order, the trial court referenced Tennessee Code Annotated 36-6-101, but it is clear the trial court was referring to 36-6-106.

## II. Issues

Mother raises two issues for our review, as stated in her brief:

1. Whether the trial court abused its discretion in designating [F]ather as primary residential parent of the parties' two youngest children, thereby separating them from their other siblings; whether equal parenting time was in the best interest of all of the parties' children.

2. Whether [M]other should be awarded her attorney fees incurred on appeal.

## III. Standard of Review

We review a non-jury case "*de novo* upon the record with a presumption of correctness as to the findings of fact, unless the preponderance of the evidence is otherwise." *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citing Tenn. R. App. P. 13(d)). The trial court's conclusions of law are reviewed *de novo* and "are accorded no presumption of correctness." *Brunswick Acceptance Co., LLC v. MEJ, LLC*, 292 S.W.3d 638, 642 (Tenn. 2008).

## IV. Analysis

### A. Primary Residential Parent Designation

Tennessee Code Annotated section 36-6-404(a) provides that any final decree for a divorce involving a minor child shall incorporate a permanent parenting plan into the decree. Tenn. Code Ann. § 36-6-404(a).[8] A permanent parenting plan is "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule." Tenn. Code Ann. § 36-6-402(3). A permanent parenting plan shall, *inter alia*, "[e]stablish the authority and responsibilities of each parent with respect to the child." Tenn. Code Ann. § 36-6-404(a)(2). Concerning a residential schedule, it "designates the primary residential parent and designates in which parent's home the child will reside on given days during the year." *Cummings v. Cummings*, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *7 (Tenn. Ct. App. Oct. 15, 2004); *see also* Tenn. Code Ann. § 36-6-402(5). A primary residential parent is "the parent with whom the child resides more than fifty percent (50%) of the time." Tenn. Code Ann. § 36-6-402(4). When fashioning a residential schedule, the trial court is instructed to

---

[8] The versions of the statutes referenced throughout this Opinion were in effect when Father filed the complaint for divorce.

make residential provisions for each child, consistent with the child's developmental level and the family's social and economic circumstances, which encourage each parent to maintain a loving, stable, and nurturing relationship with the child. . . . If the limitations of § 36-6-406 are not dispositive of the child's residential schedule,[9] the court shall consider the factors found in § 36-6-106(a)(1)-(15).

Tenn. Code Ann. § 36-6-404(b).

In any proceeding concerning child custody and visitation, "the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities." Tenn. Code Ann. § 36-6-401(a). The Tennessee General Assembly has expressed that "[t]he best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care." Tenn. Code Ann. § 36-6-401(a). "In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the [best interest] factors . . . , the location of the residences of the parents, the child's need for stability and all other relevant factors." Tenn. Code Ann. § 36-6-106(a). We have explained that, when creating a permanent parenting plan,

> [t]rial courts are not simply to perform a rote examination of each [best interest] factor and tally up those in favor of each party. *Beaty v. Beaty*, No. M2020-00476-COA-R3-CV, 2021 WL 2850585, at *3 (Tenn. Ct. App. July 8, 2021) (quoting *Steakin v. Steakin*, No. M2017-00115-COA-R3-CV, 2018 WL 334445, at *5 (Tenn. Ct. App. Jan. 9, 2018)). Instead, the relevancy and weight of the factors depend on the specific circumstances of the case. *Id.* Indeed, any one factor may prove determinative in the trial court's analysis of an appropriate parenting plan. *Grissom v. Grissom*, 586 S.W.3d 387, 393 (Tenn. Ct. App. 2019) (quoting *Solima v. Solima*, No. M2014-01452-COA-R3-CV, 2015 WL 459134, at *4 (Tenn. Ct. App. July 30, 2015)).

*Bean v. Bean*, No. M2022-00394-COA-R3-CV, 2022 WL 17830533, at *6 (Tenn. Ct. App. Dec. 21, 2022). Concerning the applicable standard of review, we note that "trial courts are vested with wide discretion in matters of child custody.'" *Schaeffer v. Patterson*, No. W2018-02097-COA-R3-JV, 2019 WL 6824903, at *4 (Tenn. Ct. App. Dec. 13, 2019)

---

[9] Tennessee Code Annotated section 36-6-406 instructs a court to limit the residential time for a parent that has engaged in certain specified conduct or who exhibits certain traits, including, in pertinent part: (1) willful abandonment; (2) physical or sexual abuse; (3) emotional abuse; (4) neglect or nonperformance of parental duties; or (5) an emotional or physical impairment which interferes with parental responsibilities. Neither party argues that the trial court should have applied Tennessee Code Annotated section 36-6-406 to limit residential time with either parent.

(quoting *Johnson v. Johnson*, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004)). Accordingly, appellate courts will not interfere with a trial court's custody determination absent an abuse of discretion. *Dungey v. Dungey*, No. M2020-00277-COA-R3-CV, 2020 WL 5666906, at *2 (Tenn. Ct. App. Sept. 23, 2020) (quoting *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017)). A trial court abuses its discretion when "its decision is not supported by the evidence, when it applies an incorrect legal standard, [or] when it reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." *Owens v. Owens*, 241 S.W.3d 478, 496 (Tenn. Ct. App. 2007) (citing *Biscan v. Brown*, 160 S.W.3d 462, 468 (Tenn. 2005)).

Mother's first issue on appeal concerns the trial court designating Father as the primary residential parent of the two youngest children, Zyana and Chayton, and awarding Father the majority of parenting time with them. Although we focus our analysis on the youngest children, because the parties presented evidence and the trial court made findings concerning all of the minor children, some facts concerning the older minor children are included in our discussion as necessary.

Turning to the final order, the trial court first stated that it was required "to order a custody arrangement that allows the parents to enjoy [the] maximum participation possible" with the children before it made findings concerning the relevant best interest factors. We note that, although the trial court considered several best interest factors, it never explicitly concluded whether a certain factor favored Mother or Father. The first best interest factor the trial court considered concerns "[t]he strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child[.]" Tenn. Code Ann. § 36-6-106(a)(1). The trial court found that Mother provided the majority of parenting responsibilities and was the primary caregiver for all of the children during the marriage as Father worked outside the home. However, the trial court found that, since entry of the Temporary Order, Father provided the majority of the parenting responsibilities for the youngest children. The trial court further found that there was no proof "regarding deficiencies in [either party's] abilities to parent." Rather, the trial court found that the issues at trial concerned "emotional bonds." The record supports these findings. It is undisputed that Mother was the primary parent during the parties' marriage as Father worked outside the home. However, since the trial court's entry of the Temporary Order in March of 2023, Father has been the primary parent for the two youngest children. The record further shows that both parents have positive and stable relationships with the younger children. Although Father testified that Zyana and Chayton were "very quiet" when he was first awarded temporary custody, he stated that they have begun "open[ing] up" to Father.

The second factor the trial court considered was:

(2) Each parent's . . . past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents . . . to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents . . . to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent . . . denying parenting time to either parent in violation of a court order[.]

Tenn. Code Ann. § 36-6-106(a)(2). The trial court made extensive findings concerning this factor and noted that it had the authority "to determine how much weight to apply to [this] factor." At the outset, the trial court stated that this factor "has been the paramount concern of the [trial c]ourt throughout this case," noting that, at the beginning, "it was probably the worst case of parental alienation that [the trial court] ha[d] seen." Specifically, the trial court found that Mother permitted the older children to alienate the younger children from Father, in direct defiance of the trial court's orders. Although the trial court found that, at the time of trial, Mother finally understood the severity of her actions and comprehended the trial court's concerns, that understanding had yet to "trickl[e] down to the older siblings[.]" Specifically, the trial court found that, when the youngest children leave Mother's house to return to Father's house, "they are reserved and closed off [for] a period of adjustment as they get settled and readjusted . . . into Father's residence." The trial court found that this reaction from the youngest children is consistent and demonstrated that Mother was not facilitating and encouraging a close and continuing relationship between the youngest children and Father. The trial court also considered the parties' history in this case and found that Mother interfered with the trial court's orders on at least three occasions. Specifically, the trial court found that Mother: (1) failed to follow up with counseling for the older children in June 2021; (2) signed her name to an order of protection drafted by Bradden, which prohibited contact between Father and the children; and (3) allowed some of the older children to participate in visits with Father when the trial court directly ordered that such visits were solely intended for the benefit of the younger children. The trial court further found that, as per the older children's testimony, the older children participated in these visits for the "protection" of the younger children, which the trial court found "blatantly contradictory" to the trial court's April 22, 2022, and September 27, 2022, orders. The trial court found that the actions of the older children "prevented [Father] from having a quality visit and working on the relationship between the [younger] children and Father," and that the trial court may have considered a different parenting arrangement had the visitations with Father "been conducted in a manner that the [trial c]ourt intended two years ago."

- 9 -

Upon review, we conclude that the record supports the court's findings set forth above. As an initial matter, during her testimony at trial, Mother conceded that she: (1) failed to follow up with counseling for the older children in June 2021; (2) allowed Bradden to draft an order of protection against Father, which she signed and filed, despite having an attorney; and (3) allowed the older children to participate in visits between Father and the younger children, despite a court order prohibiting same. The foregoing actions only furthered the parental alienation of Father and prohibited him from fostering a healthy parent-child relationship with the youngest children earlier in the divorce proceedings. As shown above, the trial court repeatedly warned Mother that such behavior could be considered when the trial court was contemplating a *permanent* parenting plan. Indeed, in considering the best interest of the children, the trial court was *required* to "consider any history of either parent . . . denying parenting time to either parent in violation of a court order[.]" Tenn. Code Ann. § 36-6-106(a)(2).

Although the record shows that Mother has made progress in her communication with Father and in her willingness to encourage all of the children to have a close relationship with him, some of Mother's actions, particularly the language she uses to speak with the children/about Father, remains concerning. In one instance, Mother testified about "when the kids were taken," referring to Father being granted temporary custody of the youngest children via the Temporary Order. In another instance, Mother testified concerning the youngest children leaving her house to return to Father. When the children asked Mother when they would be returning to her house, Mother testified that she would tell them, "I don't know, and that's all I can say." The language Mother chose to use in both of these instances only breeds further uncertainty and anxiety for the children. Stating that the youngest children were "taken" produces an image of them being kidnapped when in fact the trial court ordered their temporary placement with Father to encourage that relationship to grow. Furthermore, Mother informing the youngest children that she does not know when they will return to her home—when the parties maintain a consistent residential schedule—only fosters more fear and anxiety about living with Father as the youngest children remain uncertain of when they will see Mother or their other siblings again. Accordingly, while Mother's actions have undoubtedly improved, there remains progress to be made in her facilitation of a close parent-child relationship between the youngest children and Father.

The next factor the trial court considered was "[t]he disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care." Tenn. Code Ann. § 36-6-106(a)(4). Although the trial court found that both parties are capable of providing the children with the basic necessities, neither party brought Zyana's need for speech therapy to the trial court's attention. The trial court also found that Father "appears to be more disposed to provide the children with the necessary therapy and the necessary counseling." Although a few of the children have speech impediments that went untreated under their care, the record demonstrates that both parents are capable of providing the children with food, clothing, medical care, education, and other necessary

care. For example, Mother found an updated homeschool curriculum for the older children and enrolled them in a school co-op and other extra-curricular activities to encourage their socialization. As the trial court found, and as discussed above, the record shows that Father is more inclined to encourage the necessary therapy and counseling to repair his relationship with all of the children. Lastly, Ms. McCormack, the DCS case manager for the family, testified that she had no concerns about the living conditions of either party.

The fourth factor the trial court considered was "[t]he degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities[.]" Tenn. Code Ann. § 36-6-106(a)(5). The trial court found that Mother was the primary caregiver during the marriage but noted that Father's contributions to the family outside of the home were of "equal value and merit" to Mother's contributions in the home. The trial court further found that Father "has been in a position in the last few months to make up for lost time," and there is "no question as to [Father's] ability to parent the children in his care, whether it be on a temporary or permanent basis." The record supports these findings. *See* discussion *supra* concerning Tennessee Code Annotated section 36-6-106(a)(1).

The next factor the trial court considered was the "love, affection, and emotional ties existing between each parent and the child." Tenn. Code Ann. § 36-6-106(a)(6). As to this factor, the trial court found that all of the children have strong emotional ties with Mother, noting that the youngest children struggled to leave Mother's house to return to Father's care. Concerning Father, the trial court found that, although he had a bond with the youngest children, it was not as strong as the children's bond with Mother, due in part to the parental alienation and the dissolution of the marriage and family unit. Nevertheless, the trial court found that the bond between Father and the youngest children was being rehabilitated and would continue to improve with counseling and support from both parents. Father's testimony supports these findings. As discussed above, Father testified that the youngest children were very quiet when he became the temporary primary parent. Although the youngest children have opened up to him, Father noted in his testimony that they remain withdrawn when he picks them up from Mother's house. Father attributes this behavior to the influence the older children continue to have over the youngest children. Although Father's relationship is improving with some of the older children, it is undisputed that there remains a divide between Father and the older children.

As to the sixth factor, *i.e.,* the "emotional needs and developmental level of the child," Tenn. Code Ann. § 36-6-106(a)(7), the trial court found that both of the youngest children are intelligent, that the assessments that were previously ordered remain necessary to assist in their emotional development, and that the children need both parents in their lives. The record supports these findings. Ms. McCormack testified that all of the children performed well on their intelligence tests and that they continue to attend all of their counseling and speech therapy appointments. Concerning the seventh factor, *i.e.,* the "moral, physical, mental and emotional fitness of each parent as it relates to their ability to

parent the child," Tenn. Code Ann. § 36-6-106(a)(8), the trial court found that, while "no one is perfect," "[b]oth parents are moral people," and there was no proof of physical, mental, or emotional issues that prevented either party from parenting. The record shows that both parents have their faults and engaged in behavior that was not in the best interest of the children, *i.e.,* Father's affair and Mother's parental alienation of Father. However, the parties cannot be judged on these behaviors alone, and the overwhelming evidence in the record supports the trial court's finding that both parents are capable of parenting the children.

The eighth factor the trial court considered was:

> The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

Tenn. Code Ann. § 36-6-106(a)(9). Concerning all of the children, the trial court found that "[t]here is obvious fear, anger[,] pain[,] and confusion," that have had a "detrimental impact" on Father's relationship with the children. As to the youngest children, the trial court found that they are "thriving" in Father's care, and that Zyana in particular has enjoyed public school, participates in speech therapy, and appears to be doing well. Indeed, Father testified that the youngest children are doing "great" in public school. Specifically, he testified that Zyana is "real excited" for school, that she likes her teachers and her friends and is going to continue with speech therapy. Father testified that Chayton is in preschool and is doing well there. As to the youngest children's relationships with their siblings, the record shows that they remain close with the older children, and that the older children continue to influence the youngest children's relationship with Father.

The trial court also considered "[t]he importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment." Tenn. Code Ann. § 36-6-106(a)(10). As to this factor, the trial court found that it was "[o]bviously . . . important for these kids to maintain stability[,] [e]specially now that the kids are in counseling and making progress." Both parties' testimony showed that Father's relationship with all of the children was progressing. Although the older children were slowly starting to visit Father, Father's testimony showed that they hardly engaged with him and were more interested in visiting their younger siblings. Nevertheless, the record shows that the youngest children's relationship with Father was improving and that they were doing well in their new schools. As such, the record supports the trial court's finding that it was important for the youngest children to maintain stability, *i.e.,* remain in Father's care.

The next factor concerns whether there was any evidence presented to the trial court of physical or emotional abuse to the children, the other parent, or to any other person. Tenn. Code Ann. § 36-6-106(a)(11). The trial court found that there was no evidence of

physical, mental, or emotional abuse of the children. The "only hint" of abuse was "testimony from the older minors that they have a fear of [Father's] stern voice," but the trial court found that this did not rise to the level of abuse. On this Court's review, the record supports these findings. The parties testified that Mother was the disciplinarian during the marriage, and that the children were not familiar with Father's form of discipline, *i.e.,* a stern voice. We agree that a stern voice does not rise to the level of abuse. There was no evidence presented concerning abuse of a parent or any other person.

The trial court also considered "[t]he character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child." Tenn. Code Ann. § 36-6-106(a)(12). First, the trial court stated that it had no concerns with Father's paramour, Ms. Pufahl. Although one of the older minors testified concerning Ms. Pufahl's teenage son, the testimony centered around him remaining in his room, which the trial court found did not rise to a level of concern. Given that the older children's testimony was not transcribed, we cannot review it, and we must defer to the trial court's finding. *See PNC Multifamily Capital Inst. Fund XXVI Ltd. P'ship v. Mabry*, 402 S.W.3d 654, 661 (Tenn. Ct. App. 2012). However, we note that there was no testimony from any other witness concerning issues with either Ms. Pufahl or her children. Rather, the limited evidence shows that Ms. Pufahl's children agreed to share a room to allow the two minor children to move into their own room in the residence.

The twelfth factor concerns the reasonable preference of a child if he or she is twelve years or older. Tenn. Code Ann. § 36-6-106(a)(13). Given that the youngest children were under the age of twelve at the time of trial, this factor is inapplicable.[10] As to the thirteenth factor, *i.e.,* "[e]ach parent's employment schedule," Tenn. Code Ann. § 36-6-106(a)(14), the trial court found that neither parent's work schedule was prohibitive. There was limited evidence presented concerning either parent's employment and schedule. Mother testified that she drives for Door Dash on the weekends, and Father testified that he works approximately 35-40 hours per week for a construction company. Accordingly, the record supports the trial court's finding that neither of the parties' work schedules prohibited them from caring for the children.

Lastly, the trial court considered "[a]ny other factors deemed relevant by the court." Tenn. Code Ann. § 36-6-106(a)(15). The trial court first commended Mother on the "strides" she had made to address the trial court's concerns and on her willingness to co-parent with Father, noting Mother's agreement to keep the youngest children in public school rather than to homeschool them. The trial court also noted that Father had "room for improvement" because the children were hurt and fearful of him. Specifically, the trial court found that, "[w]hether Father agrees with it or not, [the fear and hurt are] a barrier," the children want their personal boundaries respected, and Father should be mindful of this.

---

[10] The trial court found that the older minors desired to reside with Mother and did not want to visit Father.

The record supports these findings. Although Mother found a new homeschool curriculum and enrolled the family in a school co-op for the older children, she was agreeable to the youngest children attending public school. Concerning Father's relationship with the children, it is clear that they have been hurt by Father's actions and the dissolution of the marriage. As a result, some of the older children expressed that they did not want Father hugging or touching them. Father testified that he has stopped trying to force hugs/touching with the children to respect their boundaries.

Ultimately, the trial court opined:

The [c]ourt agrees with the [GAL] that it is not ideal to separate siblings. The [c]ourt is confident, however[,] that in this particular case, if separation did not take place, based upon the history of this case and based upon what the [c]ourt heard today, the younger two [children] would be afraid of their dad, would ignore him, and would eventually refuse to engage. Were it not for the probability [and] the likelihood, in the [c]ourt's opinion, that the two younger children would follow in the older children's footsteps, it would be an equal parenting time situation. But that is not what we have today. The [c]ourt believes that were it to [o]rder an equal parenting schedule today, there would be a likelihood in a very short period of time that Father's relationship with the youngest two children would cease as well. There is no less drastic alternative than to have some separation.

We recall that our standard of review as to this issue is abuse of discretion. *Dungey*, 2020 WL 5666906, at *2. As discussed at length above, the trial court applied the correct legal standard and made extensive findings of fact, all of which are supported by the record. *Owens*, 241 S.W.3d at 496. We also recall that, when creating a permanent parenting plan, trial courts do not simply perform a "rote examination" of each best interest factor, and "any one factor may prove determinative in the trial court's analysis of an appropriate parenting plan." *Bean*, 2022 WL 17830533, at *6. Here, the trial court clearly placed the most emphasis on the second factor, *i.e.,* the willingness and ability of each parent to facilitate and encourage a close and continuing parent-child relationship. Tenn. Code Ann. § 36-6-106(a)(2). As discussed above, for two years during the pendency of the divorce, the trial court attempted to cultivate/rehabilitate Father's relationship with all of the children. Specifically, the trial court ordered the younger children to participate in visits with Father separate from the older children to allow the younger children time with Father without the negative influence of the older children. Additionally, the trial court ordered the older children to attend counseling, with the hopes that it would help repair the older children's relationship with Father. The record shows that Mother failed to facilitate these orders for some time, even going so far as to outrightly defy such orders, which resulted in the deterioration of Father's relationship with the younger children. Indeed, the record shows that, during the pendency of the divorce, Father visited with the *three* youngest children; however, at the time of trial, the third youngest child, Candace (12), had distanced

- 14 -

herself from Father and expressed her desire to live with Mother. While the separation of siblings may rarely be ordered in permanent parenting plans, such an order is not *ipso facto* against logic or reasoning. Indeed, the facts of this case lend itself to such rarity given the history of the parties, the continued behaviors of the older children, and the progress Father is making in his relationship with the youngest children. In short, the trial court ordered Father to be the primary residential parent of the youngest children, Zyana and Chayton, with the majority of parenting time, as a last resort and in an attempt to preserve Father's relationship with the youngest children. This hardly constitutes an abuse of discretion. For the foregoing reasons, we affirm the trial court's designation of Father as the primary residential parent of the youngest children. We also affirm the residential schedule awarding Father 241 days of parenting time with the youngest children and awarding Mother 124 days of parenting time with the youngest children.

### B. Appellate Attorney's Fees

Both parties seek an award of appellate attorney's fees. In Tennessee, "litigants are responsible for their own attorney's fees absent a statute or agreement between the parties providing otherwise." *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005) (citing *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000)). Tennessee Code Annotated section 36-5-103(c) allows for an award of attorney's fees "in any suit or action concerning the adjudication of the custody . . . of any child[.]" Tenn. Code Ann. § 36-5-103(c). Concerning *appellate* attorney's fees, it is within the sole discretion of this Court whether to award said fees. *Hill v. Hill*, No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Tenn. Ct. App. Dec. 17, 2007); *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). "In determining whether to award attorney's fees on appeal, we consider the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that should be considered." *Ellis v. Ellis*, 621 S.W.3d 700, 709 (Tenn. Ct. App. 2019). In exercising our discretion, we decline both parties' requests for appellate attorney's fees.

### V. Conclusion

For the foregoing reasons, the trial court's order is affirmed. The parties' respective requests for appellate attorney's fees are denied. The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed to the Appellant, April Corrine Ford. Execution for costs may issue if necessary.

s/ Valerie L. Smith
VALERIE L. SMITH, JUDGE